Frances L. Moore and Donald Grant Moore, Plaintiffs-Appellees, v. Jewel Tea Company, a Corporation, Drackett Products Company, a Corporation, The Drackett Company, a Corporation, Heekin Can Company, a Corporation, Defendants, Drackett Products Company, a Corporation, and The Drackett Company, a Corporation, Defendants-Appellants.

Frances L. Moore and Donald Grant Moore, Plaintiffs-Appellants, v. Jewel Tea Company, a Corporation, Drackett Products Company, a Corporation, Heekin Can Company, a Corporation, and The Drackett Company, a Corporation, Defendants, Jewel Tea Company, a Corporation, and Heekin Can Company, a Corporation, Defendants-Appellees.

Gen. Nos. 52,605 and 52,613. (Consolidated.)

First District, First Division.

October 27, 1969.

Rehearings denied November 21, 1969.

Wildman, Harrold, Allen & Dixon, Jon R. Waltz, of Chicago (Max Wildman, Harold W. Huff, and Howard T. Brinton, of counsel), for defendants-appellants.

Menk, Johnson, Bishop & Brooks, of Chicago (John Cadwalader Menk, of counsel), and Hubbard, Hubbard, O'Brien & Hall, of Chicago (Alvin G. Hubbard, Sam L. Miller, and Frederick W. Temple, of counsel), for defendants-appellees.

James A. Dooley, of Chicago, for plaintiffs-appellants-appellees.

MR. JUSTICE BURMAN delivered the opinion of the court.

Frances L. Moore and her husband, Donald Grant Moore, brought suit against Jewel Tea Company, Drackett Products Company, The Drackett Company, and Heekin Can Company, all corporations, to recover damages caused by an explosion of a can of Drano which resulted in plaintiff, Frances Moore, losing the sight of both eyes. The jury awarded $900,000 compensatory damages to Mrs. Moore, $20,000 to Donald Grant Moore, whose cause of action grew out of the husband and wife relationship, and an additional $10,000 in punitive damages to Mrs. Moore. These verdicts were awarded against the defendants, Drackett Products Company and The Drackett Company. The jury found that defendants, Jewel Tea Company and Heekin Can Company, were not liable for plaintiffs' injuries. Judgments were entered on the verdicts from which judgments The Drackett Company and the Drackett Products Company appeal. Plaintiffs filed a separate "conditional" appeal against Heekin Can Company and Jewel Tea Company upon the event that this cause might be reversed and remanded for another trial. These two appeals have been consolidated and have been heard together.

Plaintiff, Mrs. Frances Moore, testified that she purchased an 18-ounce can of Drano from a Jewel Tea Company store at 8346 South Racine Avenue in Chicago

115

on November 21, 1959. She said that she had used this product many times in the past. She noticed that this can had a screw-on-cap. According to Mrs. Moore, the can remained beneath the sink in her kitchen until approximately 9:30 a. m. the following day. The evidence reveals that Drackett Company manufactured Drano, which is used to open clogged drains. The purpose of the product is clearly stated on the label which says that the product "keeps drains sanitary" and "opens clogged drains fast." The Drackett Products Company is a subsidiary of The Drackett Company and is its sales company. The defendant, Heekin Can Company, manufactured the can in question and the Jewel Tea Company sold it to Mrs. Moore.

Mrs. Moore further testified that she took the can of Drano, which had remained unopened, from under her kitchen sink on the morning of November 22, 1959, went into the bathroom, set the can of Drano down on the side of the sink, reached across to turn on a cold water faucet, and then "there was a sound of an explosion and I had a terrific burning in my eyes." On cross-examination she testified that she had used Drano many times before and that her procedure had been to put two tablespoonsful in the drain—and first put the cold water in and then put the Drano in the drain. Donald Moore, her husband, was in the dining room at the time he heard an explosion and seconds later he saw his wife in the kitchen trying to splash water on her face. She told him that a can of Drano had exploded. He said he saw crystals laying all over the bathroom: in the tub, in back of the toilet, and in the sink. He also found the can of Drano in the bathtub and saw that it had burst apart at the seams. Mr. Moore called for an ambulance and took his wife to the hospital. He also took along the can of Drano to show to the doctor. At the trial he identified the can of Drano as

being the Drano can in question and it was received in evidence.

Mrs. Ida Hogan, a family friend, testified that she came to the Moore home at 10:00 a. m. on the morning in question and observed "crystals, sort of a grayish crystal in the bathroom." She saw the Drano can and testified that the cap was on. These three witnesses were the only witnesses to the occurrence.

Initially we are confronted with the contention by The Drackett Company that the plaintiffs' suit is barred by the Statute of Limitations. The record shows that the first complaint was filed by plaintiffs on January 20, 1960. The Jewel Tea Company, the Heekin Can Company and the Drackett Products Company were named as defendants. The Drackett Company was first named as a defendant in the Fourth Amended Complaint filed October 7, 1964, or about five years after the date of the injury.

On January 31, 1966, pursuant to notice, The Drackett Company presented a written motion to dismiss the Complaint on the grounds that the Fourth Amended Complaint naming it a party defendant was filed more than two years after the occurrence in violation of the Illinois Statute of Limitations (Ill Rev Stats 1965, c 83, § 15) which provides that "[a]ctions for damages for an injury to the person . . . shall be commenced within two years next after the cause of action accrued." This motion was continued by order of court to February 23, 1966. On the latter date the motion was continued by order of court to and "until such time as the case is assigned for trial." On March 4, 1966, plaintiffs moved to vacate the order of February 23rd and requested that a hearing be set for the motion to dismiss. On that date an order was entered vacating the February 23rd order and setting the motion to strike and dismiss before Judge Bua on March 22, 1966. Plain-

117

■■■■■■■■■■■■■■

tiffs, thereafter, served notice that among other things they would present the amendment to the Fourth Amended Complaint and would ask leave to file it instanter. In this amendment filed on March 25, 1966, plaintiffs alleged:

That the defendant, DRACKETT PRODUCTS COMPANY, and the defendant, THE DRACKETT COMPANY, did not distinguish themselves as they were held out to the public; that the Drano can bore the name "Drackett" in large letters, and in smaller letters bore the words, "Distributed by the Drackett Products Company"; that in their advertising material concerning Drano the public was not in any wise advised of the corporate distinction between the two companies; that several employees of THE DRACKETT COMPANY were likewise employees of the DRACKETT PRODUCTS COMPANY: that the DRACKETT PRODUCTS COMPANY was wholly owned by THE DRACKETT COMPANY; that the DRACKETT PRODUCTS COMPANY and THE DRACKETT COMPANY had their offices in the same building; that the said companies filed consolidated tax returns; that both corporations had their principal place of business in the same office and the same location in Cincinnati, Ohio; that several officials of the DRACKETT PRODUCTS COMPANY were officials of THE DRACKETT COMPANY; that several members of the Board of Directors of THE DRACKETT COMPANY were on the Board of the DRACKETT PRODUCTS COMPANY; that the said companies had the same management and were each protected by the same indemnity policy purchased from a third person; that the aforesaid circumstances were misleading and lulled the public into a mistake of fact, and that there is a joint lia-

118

bility on the part of the defendants, DRACKETT PRODUCTS COMPANY and THE DRACKETT COMPANY, and that the defendant, DRACKETT PRODUCTS COMPANY, is chargeable with any wrongful conduct of the defendant, THE DRACKETT COMPANY, and the defendant, THE DRACKETT COMPANY, is likewise chargeable with any wrongful conduct of the defendant, DRACKETT PRODUCTS COMPANY.

On April 4, 1966, an order was entered by Judge Bua denying the motion of The Drackett Company to strike the Fourth Amended Complaint and to be dismissed as a party defendant and ordering it to answer the amended complaint within fifteen days. In the notice of appeal from the final judgment, no appeal was taken from this order. In its answer to the amended complaint The Drackett Company pleaded the Statute of Limitations as an affirmative defense. On April 26, 1967, in the third week of trial, the plaintiffs were given leave to file a fifth amendment to the complaint and in an answer thereto The Drackett Company again pleaded the Statute of Limitations as an affirmative defense.

The plaintiffs contend, however, that the question of the Statute of Limitations is not before this Court. Specifically, the plaintiffs maintain that only those matters raised in the post-trial motion are before a reviewing court and that those matters must be presented specifically rather than generally in such a motion to the trial court.

██ ██ The Civil Practice Act provides that post-trial motions in jury cases must specify with particularity the grounds on which the moving party relies for relief. (Ill Rev Stats 1967, c 110, § 68.1(2)). The points must be defined in detail and clearly stated and if the motion fails to meet those standards, the error is waived and may not be asserted on appeal. Manns v. Stein,

99 Ill App2d 398, 241 NE2d 691. The reason for the above rule is stated by the Illinois Appellate Court in Perez v. Baltimore and Ohio R. Co., 24 Ill App2d 204, 210, 164 NE2d 209, 212:

> A trial judge should have an opportunity to appraise the errors which are asserted to have taken place. It is unfair to charge him with errors in a reviewing court without having brought them to his attention so that a new trial could have been granted if he found it advisable.

In the instant case defendants set forth one hundred and twenty-one points in their post-trial motion. Nowhere do they directly mention the Statute of Limitations. They claim that they preserved the question of the Statute of Limitations by their motion for a directed verdict referred to in the following two points of their post-trial motion:

16. The Court erred in refusing to direct a verdict for one or both of these defendants at the close of the plaintiffs' evidence.
17. The Court erred in refusing to direct a verdict for one or both of these defendants at the close of all of the evidence.

In our opinion the portion of the defendants' post-trial motion quoted above is lacking in the particularity required by section 68.1(2) of the Civil Practice Act and, therefore, the point has not been preserved for review. City Nat. Bank & Trust Co. of Rockford v. Almond, 42 Ill App2d 314, 192 NE2d 297.

Even if the question of the Statute of Limitations now raised by the defendants had been properly preserved, it is without merit. There are certain limited situations in which compliance with the Statute of Limitations may be excused. These are set forth in chapter

110, section 46(4), of the Ill Rev Stats which provides as follows:

> A cause of action against a person not originally named a defendant is not barred by lapse of time under any statute or contract prescribing or limiting the time within which an action may be brought or right asserted, if all the following terms and conditions are met: (a) the time prescribed or limited had not expired when the original action was commenced; (b) failure to join the person as a defendant was inadvertent; (c) service of summons was in fact had upon the person, his agent or partner, as the nature of the defendant made appropriate, even though he was served in the wrong capacity or as agent of another, or upon a trustee who has title to but no power of management or control over real property constituting a trust of which the person is a beneficiary; (d) the person, within the time that the action might have been brought or the right asserted against him, knew that the original action was pending and that it grew out of a transaction or occurrence involving or concerning him; and (e) it appears from the original and amended pleadings that the cause of action asserted in the amended pleading grew out of the same transaction or occurrence set up in the original pleading, even though the original pleading was defective in that it failed to allege the performance of some act or the existence of some fact or some other matter which is a necessary condition precedent to the right of recovery when the condition precedent has in fact been performed, and even though the person was not named originally as a defendant. For the purpose of preserving the cause of action under those conditions, an amendment adding the

121

person as a defendant relates back to the date of the filing of the original pleading so amended.

The record reveals that The Drackett Company manufactured "Drano" and the Drackett Products Company was the selling subsidiary. Roger Drackett was the President of The Drackett Company and the Chairman of the Board of Directors of Drackett Products Company. Both companies are located at the same address in Cincinnati, Ohio. In 1959, K. H. Jones was both Vice-President of The Drackett Company and President of Drackett Products Company. B. S. Shannon was Vice-President, Comptroller and Assistant Secretary of both companies. De Vore was Vice-President of both companies. J. A. Parchmann was the comptroller of both companies and there was one accounting department for both companies. A letter dated May 4, 1966, mailed to plaintiffs' counsel reads as follows:

Kirkland, Ellis, Hodson, Chaffetz & Masters
Prudential Plaza
Chicago, Illinois 60601
Telephone Randolph 6–2929

Washington Office
World Center Building

May 4, 1966

[Received May 5, 1966, James A. Dooley]

Mr. James A. Dooley
111 West Washington Street
Chicago, Illinois 60602

Re: Moore vs. Jewel Tea, et al.

Dear Mr. Dooley:

In compliance with Judge Bua's order of May 4 requiring us to clarify our pleadings and the theory of our defense pertaining to the relationship between Drackett

122

Products Company and The Drackett Company, please be advised that while these two companies are separate corporate entities, one or both may or may not be guilty of breach of warranty and/or negligence in the manufacture of Drano. If Drackett Products Company knowingly sold a product which had been negligently manufactured and if they breached any warranty, express or implied, they would be liable. Likewise, if The Drackett Company negligently manufactured a product or if they breached any warranty, express or implied, they, too, would be liable.

As you know, The Drackett Company manufactured Drano and Drackett Products Company sold it. Each was aware of the activities of the other and for all practical purposes a judgment against one is as good as a judgment against both.

Very truly yours,

/s/ Max Wildman
Max Wildman

MEW:cf

■ This case was litigated as if the Drackett Companies were a single entity and the procedures at the trial bear out this observation. Nor do we believe the motion judge erred in denying the motion of The Drackett Company to dismiss it out of the suit on the ground that the Statute of Limitations barred plaintiffs' action.

It is next contended by both Drackett Companies that the evidence was insufficient to support the verdict. This case was tried upon the Fifth Amended Complaint and answer thereto. In this amendment the plaintiffs dropped their express warranty counts and added strict liability counts. The issues were defined in plaintiffs' instruction No. 9 which set forth as to the Drackett Companies one count of strict liability, eight alleged

particulars of negligence, and three alleged particulars of wilful and wanton misconduct and concluded with the statement that "she may recover by proof of any one of said counts." It is first urged that this instruction made no distinction between The Drackett Company and the Drackett Products Company and erroneously referred to both of them as the "Drackett Companies."

We have examined the record, and it appears that no request was made by the defendants at the conference on instructions to treat the two companies separately. In fact, the verdict forms referred to the "Drackett Companies" without objection. We have concluded that this case was litigated by all the parties as if the Drackett Companies were a single entity, and the general procedure at the trial supports this conclusion.

█ As the defendants point out, the issues as to the Drackett Companies could be classified into three categories: (1) the "unreasonably dangerous" "defective condition" allegation—"a strict liability" theory; (2) the negligence allegations; and (3) the wilful and wanton allegations. The defendants did not submit a separate form of verdict pertaining to each count. Therefore, if the evidence is sufficient to support any count, the judgment must be affirmed.

The issue of strict liability is governed by Suvada v. White Motor Co., 32 Ill2d 612, 210 NE2d 182, and Dunham v. Vaughan & Bushnell Mfg. Co., 42 Ill2d 339, 247 NE2d 401. Under the basic theory of Suvada the plaintiff was required to prove that her injury resulted from a condition of the product which was unreasonably dangerous and which existed at the time the product left the manufacturer's control.

In Dunham the court stated that "the requirement that the defect must have existed when the product left the manufacturer's control does not mean that the defect must manifest itself at once." 42 Ill2d 339, 342, 247 NE2d 401, 403. The concept of a defect, the court

said, rests upon the premise that "those products are defective which are dangerous because they fail to perform in the manner reasonably to be expected in light of their nature and intended function." 42 Ill2d 339, 342, 247 NE2d 401, 403.

The plaintiff in Dunham had used a hammer for eleven months before it chipped and injured him. The use of the hammer for this time period had admittedly made the hammer more likely to chip. Judgment against the manufacturer was affirmed because the jury could properly have concluded that, considering the length and type of its use, the hammer failed to perform in the manner that would reasonably have been expected, and that this failure caused the plaintiff's injury.

■ The can of Drano in the present case, according to the testimony, was not used at all. Although the Drano had been out of the manufacturer's possession for eleven months, the evidence showed that the can had never been opened. While in Dunham the plaintiff's use of the hammer had helped to cause it to become brittle and then to chip and injure him, the plaintiff in the present case had not even opened the Drano. Intervening use, which did not bar the plaintiff's recovery in Dunham, is not even present in this case. Plaintiff could not put the Drano to its ordinary use as she intended because it exploded before it could be used at all. The jury could properly have concluded that the Drano failed to perform in the manner that would reasonably have been expected, and that this failure caused the plaintiff's injuries.

There is also sufficient evidence of the defect in the Drano at the time it left the defendant's control. Dr. William Colburn, a consulting chemist whose work involves analyzing, testing, and working out formulas of products and who maintains a laboratory for that purpose, testified that the presence of rust inside this can shows that there was moisture prior to the explosion.

125

There could not have been any rusting unless there had been some moisture in the can. It was not a uniform rusting. This rust pattern indicates that the rusting occurred while the can had the chemicals in it and not afterwards. A rusting of this character also takes time. It takes days or weeks or months. One could not get rusting like this within the period of a few seconds or a few minutes that would be required for this can to explode if water were poured into it. Dr. Colburn also testified that lumpy Drano being found in cans after they are packed shows that somehow or other moisture got into those cans. In a confined space like a closed can, if enough moisture gets in to cake the Drano, then eventually that can will explode.

In answer to a hypothetical question which included the evidence heard by the jury, Dr. Colburn testified that in his opinion, based upon a reasonable degree of scientific certainty, the information he was given was sufficient to explain how an explosion or a bursting of that can could have occurred. The reaction which produced the pressure inside the can would have been a reaction between the contents of the can and the moisture in the can. Such a reaction produces great quantities of gas so as to produce a great enough pressure to burst the can.

Dr. Colburn stated that the moisture could have entered the can through a loose cap which was shown to be a good possibility in this case. The opening in the can which let in the moisture can afterwards change in size. This can happen either by the chemical particles swelling with moisture and blocking the hole or by the metal can rusting and thus swelling to close the hole.

The moisture, according to Dr. Colburn, would then be picked up by the particles of chemicals inside the can. Since only one particle in twenty–five is aluminum, the aluminum particles are scattered among the other particles. No reaction takes place until the aluminum

particles come in contact with moist sodium hydroxide, and even then, if only a little point of aluminum or sodium hydroxide is in contact, the reaction will be minute. Since the bulk of the sodium hydroxide and other particles which have moisture on them are not in contact with aluminum, the moisture can stay in the can for quite a long time without any reaction taking place. This could be for months or years. Any migration of water vapor from moist sodium hydroxide particles over to a spot where there happens to be aluminum would be extremely slow. It would take place only if that spot where the aluminum happened to be is dryer than the other one. Otherwise, the water just stays where it is.

So, Dr. Colburn also stated, after a time there could be in this can a very slow generation of gas as the moisture distributes itself or an accumulation of moisture in the can without complete reaction having taken place and with a leak being more or less plugged up. If that can is then moved to a warmer place—and the cabinet under the kitchen sink is normally a warm place because of the hot water pipe or hot drainpipe—that is enough moisutre so that the sodium hydroxide begins to dissolve or melt. It acquires a soft or pasty consistency, and this immediately permits much better contact of the aluminum particles with this pasty sodium hydroxide solution. Adding further to that the agitation which could occur with the handling, picking the can up and setting it down, an additional opportunity is provided for contact between the aluminum and the sodium hydroxide solution. Once that contact occurs, a rapid reaction sets in producing gases, hydrogen and ammonia, that would build up internal pressure in the can and cause it to burst from the inside.

Dr. Colburn said that when the can burst the contents would spray around. These contents, if they were found sprayed and stuck to the walls, the tumbler, and

the toothbrush holder, as was true in this case, must have been damp; otherwise they are dry and when they hit the wall they fall down. So the fact that they stuck to whatever places they hit shows that there must have been some dampness in the can at the time it exploded.

Dr. Chi Tien, professor of chemical engineering of Syracuse University, New York, testified that the water could have been in the can from the date of filling or the washing of the cans by Drano might have allowed the water to get into the can. He stated that the water which was present originally in the container came in contact with the aluminum particles and that this produces hydrogen gas and heat, increases the pressure, and causes the explosion. There would be no chemical reaction and thus no explosion until the water touched the aluminum particles. Dr. Chi Tien stated that he knew of no other explanation of the situation contained in the hypothetical question.

Dr. Chi Tien also testified that if the cap of the can is able to sustain less pressure than the seam of the can, in the event that water is in the can and comes in contact with the caustic solution, gas is formed and the pressure increases inside the container, but then the top would go off and subject the contents to atmospheric conditions and there is no chance of an explosion.

Oscar Racke, a retired research chemist for The Drackett Company, who was called by plaintiffs, under section 60, stated that the pressure a can could withstand is a very important element in an explosion and once the cap goes off the pressure is released and the cap acts as a safety valve. The evidence clearly shows that the cap was still on the can after the explosion. We conclude that the evidence was sufficient for the jury properly to conclude that the Drano was unreasonably dangerous when it left the defendants' premises and that the plaintiff's injuries resulted from this condition.

128

■ The defendants next contend that improper evidence was received. First, they argue that evidence of claims of prior accidents was improperly admitted over their objection. The record reveals that the trial court limited evidence of prior accidents to explosion claims against defendants where there was no opening of the can or any extraneous matter added or anything done to it. The court not only rejected cases where water or some outside material was added to the can, it refused plaintiffs' request to allow evidence of prior spontaneous explosions which occurred after the Drano had been subjected to its normal use. Under these guidelines the plaintiffs introduced evidence of three prior accidents in which a Drano can which had not been opened exploded and after which a claim was made against Drackett.

This evidence affects the question of actual notice or knowledge to the defendants of the possibility of an explosion. Wolczek v. Public Service Co., 342 Ill 482, 500, 174 NE2d 577, 584. It is competent, not for the purpose of showing independent acts of negligence, but as tending to show that the common cause of the accidents is a dangerous and unsafe thing, City of Taylorville v. Stafford, 196 Ill 288, 291, 63 NE 624, 625; City of Bloomington v. Legg, Administrator, 151 Ill 9, 13, 37 NE 696, 697. It is also competent to show notice of this to the defendants. City of Chicago v. Jarvis, 226 Ill 614, 617, 80 NE 1079, 1080. In Gall v. Union Ice Co. (Cal App), 239 P2d 48 (1951), it was held that evidence of the explosion of another drum of sulphuric acid was proper to show the propensity of the drums to burst and hence their dangerousness. While the evidence showed the claims against Drackett were made after the can was manufactured and delivered to Jewel, but before it was sold to the plaintiff, this fact affects the weight of the testimony rather than its admissibility. Whether this evidence was admissible is, of

129

course, initially a matter for the exercise of the sound discretion of the trial judge, and we find no abuse of discretion.

The defendants also argue that if some evidence of claims of prior accidents was admissible, they should have been allowed to try the merits of such claims. The trial court prevented them from so doing. This was entirely proper because the issue was the notice to the defendants of the prior claims and the dangerous propensities of Drano, but not the legal validity of the claims. Considering the distraction of the jury and the undue consumption of time which would have resulted from allowing the defendants to present evidence on the merits of the prior claims, we find that the trial judge did not abuse his discretion by so limiting the evidence.

It is also urged that the testimony of Dr. Chi Tien as an expert, given by deposition prior to trial erroneously included two assumptions without evidentiary support. These were that there was an uneven distribution of aluminum particles in the Drano and that water was present originally in the container. Supreme Court Rule 211(c) pertaining to depositions provides in pertinent part:

> (1) Grounds of objection to the competency of the deponent or admissibility of testimony which might have been corrected if presented during the taking of the deposition are waived by failure to make them at that time; otherwise objections to the competency of the deponent or admissibility of testimony may be made when the testimony is offered in evidence.

> (2) Objections to the form of a question or answer . . . which might be corrected if promptly presented, are waived unless reasonable objection thereto is made at the taking of the deposition.

130

■ ■ Thus the rule requires objections to be made as to the form of questions or admission of testimony which might have been corrected at the time of the taking of a deposition or the objection is waived. A party complaining of defects in a hypothetical question or answer must point them out in order to afford the interrogator an opportunity to remedy the defects, if any. Goldberg v. Capitol Freight Lines, 382 Ill 283, 290, 47 NE2d 67, 71. A party cannot be permitted to sit by silently under these circumstances and then during the trial when the evidence is presented first make this objection. Since it was not made at the taking of the deposition, this objection was waived.

■ Dr. Chi Tien's answer was also proper because it was in explanation of how the explosion could have occurred. It was the doctor's reason in explaining the explosion that he felt the facts could mean that there was an uneven distribution of aluminum particles and that water was originally present in the container. This was his opinion based on a reasonable degree of scientific certainty.

■ The defendants allege that certain reports and records were improperly admitted. These were relevant as showing the manufacturer's mode of operation. That some of the reports dealt with 12-oz. cans while the can involved in the present case is an 18-oz. can is not improper. Leonard Stewart, a chemist for Drackett, testified that 12-oz. cans and 18-oz. cans did not require different pressure and were about the same in other respects. Several of the defendants' witnesses also testified concerning tests on 12-oz. cans.

■ The defendants further argue that the trial court improperly permitted the plaintiffs to present evidence that two years after the production of the type of can involved in this litigation the defendants adopted the use of a flip-top cap instead of a "paint can type."

We note that defendants' officials admitted the use of a type of flip-top can prior to the accident the same as that used subsequent to the accident. The amount of pressure the cap could withstand was very important because if it could withstand less pressure than the seam, then pressure building up in the can would blow the cap off rather than break the seam and there would be no explosion. Stewart testified that the lift-off or flip-top cap would act as a safety valve. The evidence concerning the different types of caps thus went to the issue of a defect in the product and the negligence of the defendants. We find no error in its admission.

██ ██ We turn now to the contention that the court erred in submitting the case to the jury on the theory of res ipsa loquitur. The function of this theory is to create an inference of negligence from otherwise inexplicable facts. Drewick v. Interstate Terminals, Inc., 42 Ill2d 345, 351, 247 NE2d 877, 880. But the defendants argue that the crucial and undisputed fact remains that for a period of some ten months the instrumentality in question was in the custody and control not of the Drackett defendants, but of the various common carriers, the unidentified employees and customers of the Jewel Tea Company, and the principal plaintiff and members of her household. The defendants ask what happened to the product during this lengthy time period which they say was not demonstrated in the evidence.

Many of the contentions on the present argument have already been discussed in previous paragraphs in this opinion. We hold on the basis of the evidence that it was not error for the trial court to have submitted the case to the jury on the res ipsa loquitur instruction contained in IPI 22.01. The evidence showed that the plaintiff had not opened the can of Drano. There was no evidence of any mishandling or tampering by intermediate parties. The jury found Jewel Tea Company and Heekin Can Company not liable. Since the explosion

would not have normally happened without negligence and the Drackett defendants were in control of the product when the negligence was alleged to have occurred, the jury could properly find that the Drackett defendants were negligent.

Much stress is placed by defendants on Metz v. Central Illinois Elec. & Gas Co., 32 Ill2d 446, 207 NE2d 305. In that case the Supreme Court reversed the Appellate Court which had held that the doctrine of res ipsa loquitur did not apply because the undisputed facts of the case did not show that the defendant was the only one who had access to the gas main and the opportunity to damage it. It is pointed out that the Supreme Court in reversing did not question the propriety of the rule as enunciated by the intermediate court; it stated only that the facts of record did warrant application of the rule. It is argued that the Supreme Court reaffirmed the Illinois res ipsa rule when it stated:

> When a thing which caused the injury is shown to be under the *control* or *management* of *the party* charged with negligence and the occurrence is such as in the ordinary course of things would not have happened if *the person so charged* had used proper care, the accident itself affords reasonable evidence, in the absence of an explanation by the party charged, that it arose from want of proper care. (Emphasis added by defendants.) 32 Ill2d 446, 448, 207 NE2d 305, 307.

It is also argued that the Court reiterated the settled proposition that whether the doctrine applies in a given case is a question of law.

 Of course, whether the doctrine of res ipsa loquitur applies in a given case is a question of law which must be decided in the first instance by the trial court. Drewick v. Interstate Terminals, Inc., 42 Ill2d 345, 349, 247 NE2d 877. In Dunham v. Vaughan & Bushnell Mfg.

Co., 42 Ill2d 339, 247 NE2d 401, the Supreme Court held that the requirement in a products liability case that the defect must have existed when the product left the manufacturer's control does not mean that the defect must manifest itself at once. This applies to the result of negligence as well as a strict liability case.

 A requisite that the defendants must have had exclusive control of the instrumentality would render inapplicable the doctrine of res ipsa loquitur in products liability cases. Rarely is the defendant in such actions in physical control of the article at the time of the injury. If it is shown that the product was under defendant's control at the time when the negligent cause of the injury is alleged to have occurred, it is proper to give a res ipsa instruction. Metz v. Central Illinois Elec. & Gas Co., 32 Ill2d 446, 207 NE2d 305; May v. Columbian Rope Co., 40 Ill App2d 264, 189 NE2d 394; Roper v. Dad's Root Beer, 336 Ill App 91, 82 NE2d 815.

In Nichols v. Nold, 174 Kan 613, 258 P2d 317, plaintiff sued the bottler, distributor and retailer of a bottle of Pepsi Cola which had unexplainedly exploded. The plaintiff testified that after she had purchased the bottle it had been handled carefully as was the situation in the case at bar. The trial court overruled the demurrers of the respective defendants and judgment was entered for the plaintiff. In affirming the Kansas Supreme Court stated, concerning the applicability of res ipsa loquitur in such a case:

> The real test is whether defendants were in control at the time of the negligent act or omission which either at that time or later produced the accident. 174 Kan 613, 620, 258 P2d 317, 323.

We note that the Illinois Jury Instruction Committee comment to IPI 22.01 states in part:

> The agency or instrument which causes the injury need not be in the control or management of the

defendant at the time the injury occurs. It is sufficient if the instrument has been in the control of the defendant at a time prior to the injury and there is no rational ground upon which to impute negligence to another with respect to the instrumentality after it left the defendant's control. Cobb v. Marshall Field & Co., 22 Ill App2d 143, 152, 159 NE2d 520, 524; Bornstein v. Metropolitan Bottling Co., 26 NJ 263, 270, 139 A2d 404, 409.

The next question is whether the court erred in failing to strike plaintiffs' allegations of wilful and wanton conduct. It is argued that the trial court's ruling enabled plaintiffs' counsel to show the "wealth of the defendant" and to argue at length that the defendants had been "guilty of gross disregard of the rights of the public." It is the defendants' contention that there is no evidence in the record that at any time relevant to these lawsuits the defendants had any reason, scientific or otherwise, to believe their product to be subject to spontaneous explosions. Much of the argument made in the brief sounds of the same objections made to the introduction of evidence of claims of other incidents and the records of the defendants and of no proof of defects in the can upon which we have already commented.

 It is well established in Illinois that where there is evidence of wilful and wanton conduct, punitive damages may be allowed. Madison v. Wigal, 18 Ill App 2d 564, 153 NE2d 90. Where there is a wilful and wanton charge and punitive damages are sought, proof of defendant's wealth is proper. Restatement Torts § 908; Seifert v. Solem, 387 F2d 925, 929 (7th Cir); Peters v. Lake, 66 Ill 206, 208; Chapin v. Tampoorles, 325 Ill App 219, 59 NE2d 334.

 It is difficult, if not impossible, to lay down a short and simple governing rule on this subject. Much comfort can be found in cases presented by both sides

to this issue, because whether an act is wilful and wanton is greatly dependent upon the particular circumstances of each case. Valid jury questions of wilful and wanton conduct have been presented by as little as misjudging the distance of an approaching automobile, Hering v. Hilton, 12 Ill2d 559, 147 NE2d 311, and failing to look before making a left turn, Kubajak v. Ver Brugge, 59 Ill App2d 344, 207 NE2d 344. Such issues are not unknown in products liability cases. In Toole v. Richardson-Merrell, Inc., 251 Cal App2d 689, 60 Cal Rptr 398, a punitive damages award of $250,000 was upheld where the defendant manufacturer and marketer was found to have acted recklessly and in wanton disregard of possible harm to consumers by marketing and maintaining on the market a drug which it knew could cause eye injuries and for which danger no warning was given until the weight of the accumulating evidence compelled it. The question of wilful and wanton conduct is essentially whether the failure to exercise care is so gross that it shows a lack of regard for the safety of others.

█ The caustic soda contained in Drano was known by Drackett to be greatly destructive to human tissue, particularly the eyes. Drackett employees handling caustic soda were directed to wear cotton clothing and goggles properly adjusted to the contour of the face. No such warnings were given to the public. Drano was known by Drackett to generate gas and thus pressure when moisture was added. Drackett knew the importance of whether the cap or the seam of the can would withstand less pressure, yet it employed this can without knowing its ability to withstand pressure although manufacturers of products in cans as a custom knew the properties of their containers. This knowledge by the defendants of the potential dangerousness of their product, coupled with the notice to them of prior claims of spontaneous explosions and their failure to warn the

public as they did their own employees presented a question for the jury to determine whether the defendants were guilty of wanton and wilful conduct.

We have carefully examined the entire record to determine whether the Drackett Companies were restrained from presenting their defense as contended. We have concluded that there is no merit to this contention. We agree with the defendants that there are some basic issues in this case upon which jurors especially need information because jurors do not possess the requisite expertise and special knowledge. We note, however, that there was adequate, and indeed considerable, expert testimony presented by both parties for that purpose. Because of the seriousness of this contention, we will briefly outline some of the evidence presented by the defense.

Fritz Zorn, a chemical engineer and a technical service representative with Wyandotte Chemicals, testified that his company manufactures caustic soda and sells it in drums to the defendants. He described how caustic soda is made. He said that if moisture from the air is picked up in the drums the caustic soda normally cakes and gets hard. According to Mr. Zorn, if moisture is added in any way to caustic soda, it does not change its chemical nature.

William P. O'Shaughnessy, a mechanical engineer in charge of Drackett's manufacturing department as plant manager, described how the raw materials came into the plant and are mixed. He related that the quality control department would accept or reject the raw materials and the finished goods. Mr. O'Shaughnessy stated that the quality control department had absolute control over production. He described the screening test and the heat of reaction test which were used to determine whether the batch was a good mix. The heat of reaction test readings for December 22, 1958, the

137

time the can of Drano involved in this case was manufactured, were within the normal range. Mr. O'Shaughnessy also described how the leakage test is performed on the cans, if any defects were detected, the line would be stopped and any production which had gotten beyond the end of the line would be held. No report was made if the leakage test showed no deficiency. He stated that a torque test would not be applicable to a friction type can because there is no exact screw-on torque with a friction type plug. A drop test was used instead. He also stated that small amounts of moisture added to Drano would cause caking, while large amounts of water would cause heat.

Herman Grophear, the section head of the quality control program for Drackett in 1958, said that he laid out standards for the examination of cans. He described the tests which were made at least twice a day in the latter part of 1958 from the production line of the cans after they had been filled and capped. If any cans were not properly seamed, they were rejected. In order to make Drano erupt or produce a reaction, Mr. Grophear said that water in a liquid state must be added to it and not water from moisture which is in the air like vapor. He said it is not possible to produce an eruption or cause a reaction without the addition of water. No reaction against the seams of the can could occur without the addition of water to the can because there would not otherwise be a reaction in the can that could produce a pressure to cause the seam to break. He also said that in the presence of the humid atmosphere moisture gets into things, but he observed, from his experience, that when moisture or humidity is present he found no unusual condition in the can.

Robert M. Todd, who is the current director of quality control for The Drackett Company and who worked in quality control in 1958, testified that they made con-

tinuous checks and hourly audits on the various phases of production, starting with the filling, checking heat of reaction, checking seaming, and checking torque right on down the line. A record was made of any deficiencies. A report of two flats for deficiencies on December 22, 1958, was introduced in evidence. One was for coding on the bottom rung, and the other was for high weight. Neither had anything to do with moisture in the can. They pulled out the cans that had coding defects, but the other flats were approved and released.

Dr. Lester Lundsted, Director of organic and inorganic research and development for the Wyandotte Chemical Corporation, testified that he made a study to determine what effect moisture entering through a seam or the cap would have on Drano. He described in detail the experiments that were made. In his opinion, based upon a reasonable degree of scientific certainty on the basis of his tests, pressure would not develop within the container when Drano was exposed to moisture over a long period of time. He said that in his tests part of the Drano was caked around the opening and the rest of it was perfectly free-flowing like a fresh can. Colored photographs taken while the tests were in progress were received in evidence. Dr. Lundsted also stated that the ammonia nitrate and sodium chloride in Drano take up part of the heat generated from the reaction of caustic soda and water. If the reaction of moisture and caustic soda resealed the can, Dr. Lundsted testified that there would probably not be any further reaction in the can.

Dr. Frank P. Cleveland, a consultant for The Drackett Company who is certified in the fields of anatomic pathology and forensic pathology, testified that he had become familiar with the product Drano and had conducted tests with Drano to determine the rapidity of the reaction after moisture or water was added to Drano. In his opinion based upon a reasonable degree of scientific

certainty, the mere presence of moisture within the product Drano has no significant effect upon it.

Dr. C. E. P. Jeffreys, a consulting chemist and technical director of Truesdale Laboratories, stated that as a consultant for Drackett, he was given two cans of Drano on which he made tests. He pierced a small hole in one of the cans and placed it in a small humidity cabinet for eighteen hours to determine whether there would be a change in the materials inside the can. He pierced a hole in the other can and immersed it in a vessel of water to determine the reaction. After a period of three hours he didn't notice any reaction. He increased the size of the hole and again immersed it. After ten minutes he found that the can had been resealed by a plug of sodium hydroxide. Dr. Jeffreys found no indication of any significant change in the can which had been stored in the humidity cabinet. Neither can burst. In his opinion, based on this experiment, the amount of water vapor that would come into a leaking can would react slowly because there would be so little water entering that there would be no significant reaction, except over a long period of time. He said that if the only water available is a small amount of water which is carried by the air, any reaction would be very slow, but if liquid water is added to a chemical with which it can react, the reaction can be quite rapid. In response to the hypothetical question containing the plaintiffs' evidence Dr. Jeffreys testified that, in his opinion, the facts in the question did not explain the great temperature and pressure increase which caused the rupture of the Drano can. In detailing his reasons for this opinion, Dr. Jeffreys said that the amount of water that can come in is very small. Any reaction of water coming in would be on the exposed surface and would be very slow. It would tend to form a cake and prevent the further penetration of water vapor into the can. In addition, the hydrogen gas which would be produced by the reaction

would have a rate of escape from the can four times faster than the rate of water coming in through the same hole. The ammonia would also have a greater rate of escape than the rate of entry of the water vapor.

Henry Remler, a research chemist and assistant technical director for Drackett, detailed a series of tests he made in 1956 on the Drano screw-top can. He said they tested the can for water leakage. He stated he found it to be a good package and that it would take the product to the consumer in good shape. Mr. Remler testified that any addition in weight would come from another source such as moisture in the air. There was no increase in weight during his tests.

David G. Devore, Jr., a retired Vice President of The Drackett Company, testified that the container in which Drano was packaged was changed in 1958 and 1959 from what is referred to as a friction-top to a screw-top container to eliminate the difficulty of resealing the product after opening. He said that it was desirable to reseal it tightly because otherwise moisture from the air gets in and tends to cake and solidify the product in the can. In 1958 and 1959, according to Mr. Devore, there was general use of the screw-top type can in the household chemical specialties industry.

Charles M. Wilson, the Superintendent of the Wisconsin State Crime Laboratory, testified that he did considerable work in the field of ballistics and explosives and on explosions and eruptions involving containers. He is not a chemist. He conducted pressure tests on Drano cans with a screw-top closure, and he detailed the process he used. He said that he observed the changes that occurred in the can when pressurized internally from a source of carbon dioxide. The results of the tests indicated to him that at about fifteen pounds per square inch the bottom of the can, which was normally flat, would belly out. This would frequently be accompanied by a sharp cracking sound. As the pressure

141

was increased to approximately forty pounds per square inch, there would be a crinkling sound. In the range of fifty-five to seventy pounds per square inch the can would rupture along the vertical seam and up to, and frequently through, the rolled crimp securing the tin top to the side and down to the bottom. This was accompanied by a fairly loud pop. From this, Mr. Wilson concluded, that the rupture started in the center of the vertical seam and was propagated in both directions up toward the top rolled crimped seam and down toward the juncture of the bottom rolled crimped seam and the vertical seam. He also made a study of the effect of moisture in the can and found evidence of caking.

Dr. Harvey S. Van Fleet, a chemical and metallurgical engineer, explained that the eighteen ounce can of Drano was made of uncoated steel sheet. In his opinion, based upon a reasonable degree of scientific certainty the rust in the container in this case could have existed for several years. In answer to a hypothetical question containing the basic evidence of the plaintiffs, Dr. Van Fleet was of the opinion that this amount of rust and corrosion took place after the can had been opened. Dr. Van Fleet was also familiar with the behavior pattern of the chemicals in Drano. He said that if vapor entered a small hole or the cap of the can it would quickly be absorbed by the sodium hydroxide until the hole eventually became plugged. After the moisture had been absorbed, there would be no further reaction. Dr. Van Fleet said that the tightness of the can is measured by a torque measuring device which varies from zero up to twenty-four or twenty-five inch pounds. A very low torque of approximately one inch pound would keep out moisture. In answer to a hypothetical question which included all the facts in evidence he was of the opinion that the facts enumerated could not have caused the explosion. He also said that the moisture or possibilities

142

of moisture included in the question could not have caused the explosion.

Oscar Racke, a retired Drackett research chemist, testified that he made a number of tests on Drano cans in October, 1959. To check the effect of pinholes or slight seam leaks, he immersed full cans of Drano in water. He found that where there was a leak an air bubble appeared. After immersing the cans for up to several days, the evidence of leakage would sometimes be only moisture or caked Drano. None of the cans exploded. Run shaking tests and run tests in shipping cans from Cincinnati to California and back were also made. The cans were analyzed before and after the shipping or the shaking to determine whether the aluminum had changed noticeably in its distribution. He said there was no variation in the distribution of the aluminum. Mr. Racke also checked the effect of humidity by placing cans of Drano in humidity chambers where the relative humidity was kept at approximately 98 percent at about 100 degrees Fahrenheit. When the cans were opened, some contained an area of moist Drano, and in those with an enlarged pinhole the entire contents would be caked. Mr. Racke said that after a can had thus resealed itself there would be no further reaction because no more water could enter. None of the cans exploded even after moisture was admitted from a high humidity. In answer to the hypothetical question which included the plaintiffs' evidence of the occurrence, Mr. Racke was of the opinion, based upon a reasonable degree of scientific certainty, that the facts in the question, even though undesirable, could not contribute to a can of Drano exploding. He didn't think it would be possible to build up the pressure required to burst a can. He explained that if moisture comes in through a leaky seam or a loose cap the pressure would be released at the same hole and the can would reseal itself. Where

143

any can leaks badly enough to allow water to enter, it leaks badly enough to permit any gas produced to exit.

Andrew R. Jones, the Vice President and General Manager and Chief Chemist of Applied Research Laboratories, testified that in March of 1961, he made tests of sealed Drano cans to determine the force that would be necessary to rupture a can. Using a hydrostatic test which consisted of filling the can with fluid and applying pressure against the fluid until the can ruptures, he determined that the force required was 100 to 103 pounds. In each case the can ruptured along the side seam. James G. Worth, a materials scientist and President of Allied Research Laboratories, assisted Mr. Jones in these experiments and corroborated his testimony.

It is apparent from our summary that the defendants had presented considerable evidence to support their theory that water, not moisture, must be added to Drano to cause an explosion and that the explosion could not have occurred as the plaintiffs' evidence showed the facts to be. The defendants point out, and we agree, that it is obvious that in a case of this character, the defendants cannot be expected to produce the evidence of eyewitnesses to the alleged occurrence. It is also characteristic of this type of claim that the product alleged to be defective is outside the possession of the defendants when the incident occurred. This did not prevent the Drackett Companies, however, from presenting a very thorough and able defense.

It is argued that the defendants were not fully permitted to attack the evidence of their prior notice of claims of similar incidents. We have concluded, that the defendants were given adequate opportunity to impeach and attack the evidence of the other claims and the trial court correctly ruled that these incidents should not be collaterally tried here.

It is said by the defendants that "In part her case rests upon the testimony of those who appeared as experts in support of her claim. The testimony of an expert is no more sacrosanct than is the testimony of any other witness. The law does afford the expert some preferential treatment. Because of his special knowledge, he is permitted to express opinion where that privilege is denied to others. But the very existence of this special privilege requires that the testimony which he gives be subject to closest scrutiny and the conclusion of the expert is particularly subject to refutation by every recognized form of attack." This statement applies equally to the numerous experts who testified for the defense.

The actual trial consumed five weeks. The record, exclusive of numerous exhibits, is over 2,700 pages long. The briefs filed by the parties separately average over 140 pages in addition to a lengthy reply brief. There is much said by the defendants to the effect that their cross-examination of witnesses was improperly restricted, but we find no merit to this contention. The defendants were represented by one of our ablest trial attorneys. A reading of the record shows that by one means or another he prevailed upon the court to bring his theories of the case to the attention of the jury.

The defendants offered exhibits in the form of movies to show tests of the Drano product made by experts. These were excluded, and the court correctly held that there was enough evidence for the defense by experts and other exhibits on this issue. Nor are we persuaded that witnesses for the plaintiffs were repeatedly permitted to give testimony which was based upon guess or conjecture with no evidentiary basis and which were expressions of surmise and hypothesis. The jury has the duty of sifting the evidence and

as the fact finder may draw reasonable inferences. An inference is not a surmise or conjecture. Jurors may disbelieve testimony, particularly when contradictory testimony of experts is presented to them. Much of the argument requires inferences to be drawn from the facts. This has always been held to be the province of the jury. The jury was properly instructed on the issues and made its deliberate determination. We cannot say the court abused its discretion on offered testimony, particularly concerning opinion evidence by defense experts.

Finally, the defendants contend that the argument of plaintiffs' counsel exceeded the bounds of propriety. We must note that this point is but briefly mentioned. We do not find sufficient merit in this contention to justify a finding of reversible error.

The ultimate question on this appeal is not whether the trial was scrupulously free from error, but whether any error occurred which operated to the prejudice of the defendants or unduly affected the outcome. Considering the evidence which supports the jury's verdict, as well as the law applicable to the alleged errors raised here, it is our conclusion that there is no error which would justify a reversal in this case. On the whole record we find no cause to disturb the verdict. The jury was fully and accurately instructed on every phase of the law materially affecting the rights of the defendants. We believe substantial evidence supports the verdict of the jury and the judgment entered thereon. We find no reversible error.

Our disposition of this case makes it unnecessary to consider plaintiffs' separate appeal against the Heekin Can Company and the Jewel Tea Company which was conditioned upon the event that this cause be reversed and remanded for another trial.

All assignments of error have been reviewed. The record discloses no error. Accordingly, the judgment is affirmed.

Affirmed.

ADESKO, P. J. and MURPHY, J., concur.