LEE F. FULLERTON *et al.*, Indiv. and d/b/a Fullerton Coal Company, Plaintiffs and Counterdefendants-Appellees, *v.* JOHN H. ROBSON *et al.*, Indiv. and d/b/a Marquette Coal & Mining Co., Defendants and Counterclaimants-Appellants.

First District (5th Division)   Nos. 76-318, 76-747 cons.

Opinion filed May 19, 1978.—Rehearing denied July 14, 1978.

William J. Harte, Ltd., of Chicago (John Gervasi, of counsel), for appellants.

Chatz, Sugarman, Abrams & Haber, of Chicago (Joel A. Haber and Leonard O. Abrams, of counsel), for appellees.

Mr. JUSTICE LORENZ delivered the opinion of the court:

Defendants (Marquette) appeal from a judgment awarding plaintiffs (Fullerton) $51,366 in damages for breach of contract and denying their counterclaim. On appeal Marquette contends that (1) the trial court erred in admitting irrelevant and prejudicial evidence; (2) the trial court improperly excluded certain exhibits and testimony; and (3) the jury verdict is against the manifest weight of the evidence.

At trial the following pertinent evidence was adduced.

*For the plaintiffs*

*Plaintiff Lee Fullerton on his own behalf*

He is a coal broker or wholesaler who sells coal directly from the mines to coal retailers. During 1970 he sold coal to Marquette on a continuing basis in response to phone orders from William Robson. The coal, all of which was "Hi-Glo" stoker, was shipped directly from the mines to Marquette. In late October, 1970 Robson requested that Fullerton stop coal shipments, explaining several weeks later that Marquette's customers had been complaining about the coal. Although he has demanded payment, Marquette has refused to pay $51,366 for coal which it ordered and received.

On cross-examination he admitted that in a phone conversation with Robson and in a confirming letter, he agreed to sell Hi-Glo #3 coal to Marquette. Although he does not recall telling Robson a different kind of coal would be shipped, he does state that all stoker coal is basically the same. He admits that in his deposition he stated he would have no way of knowing whether the coal shipped to Marquette conformed to his original proposal.

*Richard M. Mac Donald*

He managed nine apartment buildings which were using Marquette coal in 1971. Because Marquette raised the price of coal, he changed to another supplier at a lower price. The price of the coal was the only reason he changed suppliers.

On cross-examination he admitted that the owner of one building had questioned the grade of coal supplied by Marquette.

*For the defendants*

*William Robson, Jr., on his own behalf*

He is a partner in Marquette with responsibility for purchasing coal. He began purchasing "Hi-Glo" stoker coal from Fullerton in 1968, having determined it met customer needs. During the fall of 1970 he received an unusual number of complaints about the coal and ordered Fullerton to stop shipments. However, a large quantity of previously delivered Fullerton coal was stocked in the Marquette yard. In order to make this coal suitable for customer use he had to mix it with better coal, borrowing $500,000 to finance the operation. He also had to pay $27,644.77 in freight charges for delivery of Fullerton coal which he termed "worthless."

On cross-examination Robson stated that he could not recall any unusual expenses while the $500,000 loan was outstanding. He admitted, however, that the State of Illinois had brought a civil action against the Chicago Coal Merchants Association and that both he and Marquette were named defendants. Although he did not recall the amount of attorneys fees expended in defense of that suit, he did admit that Marquette paid $18,300 in settlement of the action.

On redirect he explained that the proceeding was an antitrust suit against all the Chicago coal dealers. He paid the settlement when his attorneys advised him that to do so would be less costly than defending the suit.

*Edwin Borre, Chester Miroslaw*

Chester Miroslaw is manager of the Marquette coal department. During the fall of 1970 he received a number of customer complaints which he referred to Edwin Borre. Borre was sales manager of Marquette in 1970. It was Borre's opinion that those customers who quit Marquette did so due to the poor quality of the coal. On cross-examination Borre admitted Marquette had in its yard coal from other suppliers as well as from Fullerton.

*Leo Carskie, Ted Smolarek, Leon Robinson, Edward Brinkman, and Lorenze Garcia*

Carski and Smolarek are building janitors; Robinson owns apartment buildings, and Brinkman and Garcia are building managers. Although they had no complaints about coal from Marquette previously they began to experience problems with the coal during 1970-71.

*William Harper, Leonard F. Oberheide*

Harper is secretary-treasurer of the J. W. Peterson Coal and Oil Co., a coal retailer. Oberheide is vice-president of Oberheide Coal Co. On cross-examination they each admitted that their companies had been named as defendants in the civil action brought by the State of Illinois against the Chicago Coal Merchants Association. Although Oberheide did not know the basis of the suit, Harper stated that the allegation was "we

conspired to fix prices and to allocate markets." Both companies contributed money to the settlement of the suit.

During closing argument counsel for Fullerton, over defendant's objection, commented that Robson, Harper and Oberheide "were so concerned about their customers that the State of Illinois filed a class action against these people * * *." Fullerton's counsel proceeded to quote specific allegations from the antitrust complaint concerning the "conspiracy" to "fix, control, and maintain the retail price of coal in the Chicago area * * *."

The jury returned a verdict in favor of Fullerton on the complaint and on Marquette's counterclaim, setting damages at $51,366.

OPINION

Marquette contends that the trial court erred in admitting evidence concerning the antitrust suit brought against defendants by the State of Illinois.

The admission of evidence rests largely within the discretion of the trial judge, and his decision should not be reversed unless that discretion has clearly been abused. (*Cole v. Brundage* (1976), 36 Ill. App. 3d 782, 344 N.E.2d 583.) The trial judge should, in the exercise of his discretion, exclude otherwise relevant and useful evidence "whenever the evil of confusion of issues impends." *Forest Preserve District v. Draper* (1944), 387 Ill. 149, 156, 56 N.E.2d 410, 414.

■■ During the trial of this breach of contract action the jury heard repeated evidence of the fact that the State of Illinois had brought an unrelated antitrust suit against defendants and the employers of two defense witnesses. Fullerton argues that testimony regarding the antitrust suit was relevant and properly admitted to attack Robson's credibility and to refresh his recollection of any unusual expenses he may have incurred. Fullerton further argues that the evidence was proper to show the bias and interest of witnesses Harper and Oberheide. Although this evidence may have been relevant as urged by Fullerton, it was, nevertheless, of such a nature as to confuse the jury and divert its attention from the issues presented at trial. With such an "evil of confusion" impending, the trial judge, in the exercise of his sound discretion, should have excluded evidence concerning the antitrust suit. *Forest Preserve District v. Draper* (1944), 387 Ill. 149, 56 N.E.2d 410.

■■■ Fullerton contends, however, that Marquette waived objection to the initial introduction of this evidence by failing to object at trial. In *People v. Trefonas* (1956), 9 Ill. 2d 92, 98, 136 N.E.2d 817, 820, the supreme court stated:

> "The function of the objection is, first, to signify there is an issue of law, and, secondly, to give notice of the terms of the issue. An objection to the admission of evidence, to be available, must be made in apt time, or it will be regarded as waived."

While we agree that a party cannot urge on appeal an objection it failed to make at trial, we do not agree that Marquette failed to object here. Robson was asked on cross-examination whether Marquette had incurred any unusual attorneys fees and responded that they were named defendants in a lawsuit brought against the Chicago Coal Merchants. When Robson was next asked whether that suit cost Marquette any money in fines, Marquette's counsel stated, "Your honor, I am going to object." Although the objection was sustained Marquette's counsel requested a clarification for the jury, stating, "I think there is a definite reason why this was brought up and I would like it overcome."

During a conference that followed these comments, the trial judge stated that "it was a civil case, so we don't have to worry about it." He then instructed Fullerton's counsel to bring out the fact that it was a civil proceeding against all the coal dealers. At this point the following exchange occurred.

"DEFENDANTS' COUNSEL: You are not putting in the consent decree?

PLAINTIFFS' COUNSEL: I am going to put it in. I am going to ask him if it cost him eighteen thousand three hundred dollars; if he had to pay that amount plus attorneys fees.

DEFENDANTS' COUNSEL: All this has no bearing on this case.

PLAINTIFFS' COUNSEL: But, the expenses his business incurred and he borrowed five hundred thousand dollars.

THE COURT: This is the impression he gave."

The court then permitted Fullerton's counsel to question Robson concerning the antitrust suit. We believe Marquette's objections here were made in apt time and were "stated in such a manner as to inform the court of the point being urged." *Styblo v. McNeil* (1943), 317 Ill. App. 316, 328, 45 N.E.2d 1011, 1016.

■■ Fullerton next contends that Marquette failed to object when the consent decree was shown to Robson on cross-examination and when witness Oberheide was questioned concerning his involvement in the same antitrust suit. The court had previously permitted questioning of Robson concerning settlement of the antitrust suit and of Harper concerning his company's involvement in the same antitrust suit. The court had rejected Marquette's objections to these lines of questioning. The subsequent questioning of Robson concerning the settlement and of Oberheide concerning his role in the same antitrust suit were matters covered by the prior objections and rulings. After the court has denied an objection properly made, the objection need not be repeated thereafter as to matters covered by the prior objection and ruling. (*Chicago Union Traction Co. v. Lauth* (1905), 216 Ill. 176, 74 N.E. 738.) It was therefore unnecessary for Marquette to repeat its objection and "[s]uch conduct on

the part of counsel for defendant would have been improper, and no right was lost by failing to adopt such a course." *Chicago Union Traction Co. v. Lauth* (1905), 216 Ill. 176, 180, 74 N.E. 738, 739.

Fullerton further contends that on redirect examination counsel for Marquette himself questioned Robson as to the nature of the antitrust suit and Marquette's reason for agreeing to the settlement. Fullerton argues that Marquette's introduction of this evidence constitutes a waiver of its previous objections. However, there is no waiver of objection to testimony where, after the objection has been overruled, the objecting party introduces controverting evidence. *(Chicago City Ry. Co. v. Uhter* (1904), 212 Ill. 174, 72 N.E. 195.) In *City of West Frankfort v. A. C. Marsh Lodge No. 496, I.O.O.F.* (1924), 315 Ill. 32, 36, 145 N.E. 711, 713 the court stated:

> "* * * the fact that the appellant submitted to the view expressed by the court as to the method of trial and examination of witnesses was no waiver of its objection. It had a right to try the case in the manner which the court had decided was right, without waiving its objection to the fact that it was wrong."

■■ Fullerton also contends that Marquette waived objection to the evidence by consenting to the reading of the consent decree by Fullerton's counsel during closing argument. During a conference prior to closing arguments, the trial judge stated that Fullerton's counsel could read the consent decree to the jury during closing argument. At this point counsel for Marquette stated, "you can read the whole thing as far as I'm concerned." Marquette argues that this remark was merely made in "disgust." While we do not condone the making of comments in disgust during the course of a trial, we do not believe the statement constitutes a waiver since it was made after the trial judge had already ruled that the consent decree could be read to the jury.

■■ Marquette also contends that the trial court improperly excluded certain evidence and that the jury verdict is against the manifest weight of the evidence. Marquette failed to include these assignments of error in its post-trial motion and is, therefore, deemed to have waived them on appeal. *Hull v. City of Griggsville* (1975), 29 Ill. App. 3d 253, 330 N.E.2d 293.

For the foregoing reasons the cause is reversed and remanded to the trial court with directions to grant a new trial in conformity with the views expressed herein.

Reversed and remanded with directions.

MEJDA and WILSON, JJ., concur.