SAYERS B. JOHNSON, Indiv. and as Ex'r of the Estate of Elsie P. Johnson, Deceased, Plaintiff-Appellant, *v.* AMERCO, INC., *et al.*, Defendants-Appellees.

Fifth District    No. 78-223

Opinion filed August 5, 1980.—Rehearing denied September 17, 1980.

Cohn, Carr, Korein, Kunin, Schlichter & Brennan, of East St. Louis (Rex Carr, of counsel), for appellant.

Edward J. Kionka, of Columbia, W. Thomas Coghill, Jr., of Pope & Driemeyer, of Belleville, and Joseph S. Kelly, Jr., of U-Haul International, of Phoenix, Arizona, for appellees.

Mr. JUSTICE KARNS delivered the opinion of the court:

Plaintiff, Sayers B. Johnson, individually and as executor of his wife's estate, appeals from the judgment of the Circuit Court of St. Clair County entered upon directed verdicts at the close of the plaintiff's case for the defendants, Amerco, Inc., U-Haul Co. of Central Illinois, a corporation, and William Albright, d/b/a Bill's Texaco Service Station. The defendant Amerco, Inc. (now called U-Haul International) operates the U-Haul

trailer rental business through companies organized within the individual States, which in turn operate through individual dealers. The system includes the engineering, manufacturing, and insuring of the trailers rented.

This case concerns an accident in which the plaintiff's car, while towing a U-Haul trailer, went out of control and left the highway. No other vehicles were involved. According to plaintiff, the injuries to himself and his wife were relatively minor. Plaintiff was the only occurrence witness to testify, Mrs. Johnson having died prior to trial.

On August 24, 1973, the plaintiff rented a 6- by 12- foot "road van" (RV) tandem-axle U-Haul trailer from defendant Albright, a U-Haul dealer in East St. Louis. The trailer was attached to a permanently mounted hitch on the plaintiff's 1969 Oldsmobile Delta 88 automobile.

The plaintiff and his son loaded the trailer with household goods, which the plaintiff and his wife were moving to Texas. While the parties dispute the exact gross weight of the loaded trailer, the difference is so small as to be immaterial. It is sufficient to say that the loaded trailer weighed about 5,000 pounds. The gross weight of the automobile including goods and passengers was also approximately 5,000 pounds.

Mr. and Mrs. Johnson left East St. Louis at about 2 p.m. on August 25, 1973. Mr. Johnson drove for about 100 miles, proceeding southwest through a hilly area of Missouri on Interstate 44. At St. James, Missouri, Mrs. Johnson took over the driving and proceeded about 40 miles to a point near Waynesville, Missouri.

As they were going down a long hill at about 45 miles per hour the car began to accelerate, and Mrs. Johnson tapped the brake. The trailer began to "sway", that is, swing sideways back and forth behind the car. The swaying increased, and the car and trailer swerved from one lane to another several times. Mrs. Johnson's attempts to exercise control by steering and braking were unsuccessful. The car and trailer left the road on the left side and separated at the time of impact, apparently with the shoulder or embankment of the highway. The trailer turned completely around and came to rest with its rear end against an embankment farther downhill from where the car had stopped. The hitch had torn from the car and remained attached to the trailer.

Plaintiff brought this action against the defendants for compensatory and punitive damages on theories of strict product liability, negligence, and willful and wanton misconduct. During the trial, the court granted the defendants' motions to refuse admission of numerous prior accident reports submitted to U-Haul as well as evidence concerning two previous accidents, involving Larry Slightom and Margaret Hayman which resulted in lawsuits against U-Haul. At the close of the plaintiff's case, the court granted the defendants' motions for directed verdicts on all counts and ruled inadmissible various items of evidence presented.

The strict liability counts alleged that the RV trailer, when attached to the plaintiff's car, was unreasonably dangerous to persons using the highways including the plaintiff "on account of the inherent tendency under the conditions then and there present for the trailer to slide, veer and gyrate over and upon the highways" and that, as a proximate result, the accident occurred. The trial court's directed verdict on this claim was apparently primarily based on a failure of proof of causation. However, defendants argue extensively on appeal that the trial court's ruling is also sustainable because the plaintiff failed to prove an unreasonably dangerous condition.

■■ To recover under strict liability in tort, the plaintiff must prove that his injury or damage resulted from a condition of the product, that the condition was an unreasonably dangerous one, and that the condition existed at the time the product left the manufacturer's control. (*Suvada v. White Motor Co.* (1965), 32 Ill. 2d 612, 210 N.E.2d 182.) Our supreme court has explained the concept of a "defect" as follows:

> "Although the definitions of the term 'defect' in the context of products liability law use varying language, all of them rest upon the common premise that those products are defective which are dangerous because they fail to perform in the manner reasonably to be expected in light of their nature and intended function." *Dunham v. Vaughan & Bushnell Manufacturing Co.* (1969), 42 Ill. 2d 339, 342, 247 N.E.2d 401, 403.

■■ A *prima facie* case that a product was defective and that the defect existed when it left the manufacturer's control is made by proof that in the absence of abnormal use or secondary causes the product failed to perform in the manner reasonably to be expected in light of its nature and intended function. (*Tweedy v. Wright Ford Sales, Inc.* (1976), 64 Ill. 2d 570, 357 N.E.2d 449; see also *Walczak v. General Motors Corp.* (1976), 34 Ill. App. 3d 773, 340 N.E.2d 684; Annot., 51 A.L.R.3d 8 (1973).) In *Tweedy*, the court affirmed a judgment for the plaintiff on evidence that the brakes of his car failed to operate during normal use, even though the plaintiff offered no expert testimony concerning the presence of a specific defect and the defendant presented expert testimony tending to show the absence of any malfunction.

The rule stated in *Tweedy* excusing proof of a specific defect had already been adopted by this court in *Bollmeier v. Ford Motor Co.* (1970), 130 Ill. App. 2d 844, 265 N.E.2d 212, where we held that proof of a malfunction during normal use which tends to exclude other extrinsic causes is sufficient to make a *prima facie* case on the issue of the existence of a defective condition. Accordingly, we reversed a directed verdict entered at the close of the plaintiff's case on the strict liability claim,

where there was evidence that a car's steering system had failed to operate at the time of the accident, despite evidence that the steering had never previously failed to respond, that it was functional following the accident, and that defendants' expert had discovered no defect.

■■ *Tweedy* and *Bollmeier* basically concern proof of an unreasonably dangerous condition. *Suvada* also requires proof that the plaintiff's injury or damage was proximately caused by a condition of the product. Proof of a dangerous condition will not establish liability where the evidence strongly suggests that the injury or damage resulted from external causes. (*Rockett v. Chevrolet Motor Division, General Motors Corp.* (1975), 31 Ill. App. 3d 217, 334 N.E.2d 764.) However, it is not incumbent on the plaintiff to disprove with certainty all other possible causes, even where there is some evidence of misuse or abuse of the product. *Spotz v. Up-Right, Inc.* (1972), 3 Ill. App. 3d 1065, 280 N.E.2d 23.

The issue here is whether the plaintiff's proof of an unreasonably dangerous condition and proximate cause was adequate to withstand the defendant's motion for a directed verdict under the test stated in *Pedrick v. Peoria & Eastern Railroad Co.* (1967), 37 Ill. 2d 494, 229 N.E.2d 504, that is, whether all of the evidence, when viewed in its aspect most favorable to the plaintiff, so overwhelmingly favors the defendants that no contrary verdict based on that evidence could ever stand.

Plaintiff's son, William Johnson, testified that he accompanied his father to the service station where the attendant hooked the trailer to the car. The next day, he assisted the plaintiff in loading the trailer. He had used and loaded rental trailers about 15 or 20 times before, although he had never rented a tandem-axle trailer. They loaded the trailer with ordinary household goods, attempting to place heavier items in the front of the trailer in accordance with instructions inside it stating that 60 percent of the weight should be placed in front of a line across the center of the floor. There was also a speed limit sign of 45 miles per hour on the rear of the trailer. He saw no notice concerning weight of the trailer. While loading, they placed blankets and pillows between boxes that did not fit snugly against one another. When all the goods were inside the trailer, there was room remaining above the load, and they tied ropes over the rear of the load to prevent it from shifting. He stated that if there had not been a proper forward weight distribution inside the trailer, he would have been able to wiggle the trailer tongue at the connecting point. However, he was unable to budge the tongue, and estimated the tongue weight to be 400 to 500 pounds. The rear of the automobile was depressed 3 to 6 inches. When his father and mother left, they returned a dolly to the service station. The attendant checked the connection and walked around the car and trailer.

Both William Johnson and the plaintiff testified that on prior

occasions they had received U-Haul trailer user's guides in renting U-Haul trailers, but that they did not receive one this time. They apparently knew that the guides were available but felt competent to load the trailer based on past experience.

The plaintiff also testified concerning the loading of the trailer. He stated that the goods came all the way to the rear of the trailer on the floor, but that there were 18 to 24 inches of space above the goods in the front half of the trailer and about 3 feet above the goods in the rear. He estimated that the rear of the car was depressed 2½ to 3 inches. His car had traveled about 35,000 or 36,000 miles, and he had had it tuned and checked within 2 weeks before the trip. Both Mr. and Mrs. Johnson had driven cars towing trailers without mishap.

While the plaintiff was driving during the first 100 miles of the trip, he maintained a speed of 40 to 45 miles per hour. Going down hills the speed would increase to about 50 miles per hour, but he did not apply his brakes when this happened. Mrs. Johnson also maintained a speed of 45 miles per hour. Before reaching the hill on which the accident occurred, they went down what may have been a steeper hill, but Mrs. Johnson did not apply the brakes in descending it.

Mr. Johnson further testified that on the hill in question, the trailer did not begin to sway until Mrs. Johnson tapped the brakes. She attempted to gain control by steering as the car and trailer swerved between the two lanes of the highway. Plaintiff testified that "* * * when it was going right she would turn the wheel to the left, and then by the time it straightened out, she would have to turn it back to the right again." The car changed lanes six or more times before leaving the highway. At some point, Mrs. Johnson pushed the brakes "all the way down." However, the plaintiff "couldn't tell" that this tended to slow the car, and he did not hear the wheels lock or feel the car or trailer actually skidding.

Henry Tummons, the insurance adjuster who investigated the accident, testified that the plaintiff's car sustained rather extensive undercarriage damage, damage to the rear end, a broken windshield, and sheet metal damage. However, to his knowledge there were no repairs to the brake system.

L. S. Shoen, founder of the U-Haul system and president of the holding company that wholly owned the defendants Amerco, Inc., and U-Haul Company of Central Illinois, testified under section 60 examination. It was his decision to establish, what he called the "maximum controllable speed" recommendation of 45 miles per hour which appeared on the rear of the trailer rented by plaintiff. However, he explained that the varying recommendations as to the maximum speed made by U-Haul over the years for its various trailers were not based on scientific calculation or fact. Rather they were intended as a conservative recommendation to compensate for any tendency on the part of trailer

users to operate at highly excessive speeds. Likewise, the admonition in the trailer user's guide that the maximum gross trailer weight should not exceed 3500 pounds was also intended merely as a cautionary device to prevent users from grossly overloading a trailer to 7000 or 8000 pounds.

Accordingly, he thought it reasonable for a user to load fully a trailer, even though an RV trailer would exceed 3500 pounds when only 70 percent loaded with ordinary household goods weighing 7 pounds per cubic foot and the HV, 6 by 14 foot, trailer would exceed the 3500-pound limitation when loaded more than half-full. He also acknowledged that "ordinary household goods" might exceed 7 pounds per cubic foot depending on the nature of the given householder's goods. Mr. Shoen did not expect that the average user would go to a scale and actually weigh the trailer. In addition, he assumed that the user would have no practical means of determining that the trailer load was properly distributed, other than to simply estimate the weight and try to put the heavier items in the front of the trailer. He expressed the opinion that it was safe to touch the brakes, hit a bump, pass a bus, or top a hill with a properly loaded trailer at 60 miles per hour. As a general rule, he considered that "* * * the larger the vehicle, the greater the mass of the conveying vehicles in relationship to speed, the greater the likelihood of having an accident." However, he believed that the RV trailer was safe based on the testing of this and other U-Haul trailers, his own extensive personal use of the trailers, and statistics indicating that even the more accident prone HV trailer traveled an average of about 2½ times as many miles per accident as did the average passenger car without a trailer behind it. Accident statistics also indicated that the RV trailer had a lower accident rate than the other tandem axle U-Haul van models and the 5- by 10-foot single-axle model.

Professor Wallace Diboll testified as an expert witness on behalf of the plaintiff. He was an associate professor of mechanical engineering at Washington University where he had been employed for 23 years. He held a masters degree in mechanical engineering and had served as a consultant to private industry in various capacities. His specialty was the area of vibrations and stress analysis of fluid mechanics of machinery. However, he had also conducted laboratory model testing and analysis on the problem of trailer stability. For a number of years, he had owned and towed Airstream travel trailers. He had test driven his current 23-foot single-axle trailer loaded to about 5000 pounds. He had never tested a U-Haul RV trailer but said that the same concepts of physical motion applied to travel and utility trailers. He considered his Airstream trailer to be of approximately the same mass and configuration as the U-Haul trailer, although his trailer was appreciably larger, and the U-Haul trailer had a higher center of gravity. He agreed that numerous factors other than speed and weight had to be considered in determining the dynamic

stability, that is, stability while in motion, of a car-trailer combination. However, aerodynamic factors were of secondary importance. Trailer mass and center of gravity were primary considerations.

Diboll had designed, constructed and installed a "weight-carrying" hitch. This type of hitch (the type on the plaintiff's car) had the effect of transferring the forces exerted by the trailer tongue entirely onto the rear wheels of the car. He had also installed and adjusted the "weight-equalizing" or "weight-distributing" type of hitch, which he used with his trailer. The function of this hitch design was to distribute the forces exerted by the trailer equally over the four wheels of the tow car. Professor Diboll stated that this would increase the car's ability to resist oscillation if the trailer was properly loaded more heavily in the front.

He considered it safe for a car weighing 5000 pounds to tow a trailer of the same weight with a weight-carrying hitch at 35 miles per hour. However, he would not exceed this speed without further testing. He considered it unsafe for this combination to travel at 45 miles per hour. An accident would not necessarily occur at 45 miles per hour, but going down a hill or braking under certain conditions could lead to instability or oscillation that might result in an increasing twisting effect of the trailer upon the car. A car with a weight-carrying hitch attached to a trailer with a tongue weight of 300 to 350 pounds might remain stable going down a hill, but might become unstable on the same hill if the tongue weight was 450 or 500 pounds.

On cross-examination he acknowledged that his opinions as to safe speeds were not based on actual measurements or application of the formulas derived in his laboratory experimentation with trailer stability. He could not tell at what speed the specific car-trailer combination involved in this case would become unstable. However, he believed that his own trailer towing experience afforded a sufficient basis for his opinions.

Dr. Gerald Dreifke also testified on behalf of the plaintiff. He held degrees in electrical engineering and engineering mechanics. He had been an aircraft design engineer and was formerly chairman of the department of electrical engineering and in charge of the graduate school of engineering at St. Louis University. He had consulted and performed research in engineering areas for industry and government and had testified in litigation involving various types of industrial and automobile accidents.

Dreifke testified concerning a formula he had derived in connection with a previous lawsuit against U-Haul. He began with a principle of Newtonian physics that the momentum of an object is a quantity equal to its mass multiplied times its velocity, and that that quantity is equal to the

summation of all the forces that are applied to the object. In the case of an automobile, Dreifke called this summation of forces "the control forces on the automobile." He further declared that "[t]he trailer is dependent upon the car for its principle methods of control." Dreifke related these ideas to an equation of Newton and derived a formula that the mass of the car multiplied times the velocity of the car was equal to the mass of the car plus the trailer, multiplied times a certain unknown velocity of the car-trailer combination. According to Dreifke, this formula supported the conclusion that a car pulling a trailer of the same weight at a given speed was only as controllable as the car alone traveling at twice that speed. That is, a 5000-pound car pulling a 5000-pound trailer at 35 miles per hour was only as controllable as the car alone would be at 70 miles per hour. Similarly, the same car and trailer combination at 45 miles per hour was only as controllable as the car alone at 90 miles per hour.

Dr. Dreifke then added the assumption that the former 70-miles-per-hour speed limit on interstate highways was an expression of the consensus "maximum controllable speed" for the average automobile. He also assumed that the car and trailer were satisfactorily designed with regard to stability and in good working condition, that the trailer was properly loaded with a forward weight distribution producing a 10 percent tongue load, and that the driver was a "typical human being." Armed with these assumptions and the above application of his formula, he concluded that the maximum controllable or "safe" speed for a 5000-pound car pulling a 5000-pound trailer was 35 miles per hour.

On cross-examination, Dreifke acknowledged that he knew of no scientific analysis applying his formula as he was applying it. He had conducted no tests to determine the controllability or stability of any car and trailer combination and had not considered accident statistics in connection with his formula. He understood U-Haul's trailer testing facility was the best in existence. He had towed U-Haul trailers, of a different type than the RV, two or three times without mishap since developing his formula. Numerous factors other than weight and speed could affect the stability of a given car and trailer combination. A wide variety of forces were not explicitly included in his formula. But according to Dreifke, the various forces acting upon the system were "implicitly" considered in his formula as applied together with the assumptions explained above.

John Abramovage, general manager of technical services for U-Haul International, testified under section 60 examination. This examination lasted about a month and a half and occupies 20 volumes of trial transcript. The trial judge accurately observed that the questioning of plaintiff's counsel was often repetitious and the witness often evasive.

Much of this testimony consists of inconclusive examination about numerous reports of tests conducted by U-Haul and other companies concerning various aspects of the performance of U-Haul trailers.

As L. S. Shoen, Abramovage stated that the 3500-pound weight limitation for U-Haul trailers given in the trailer user's guide was merely a conservative recommendation. It had "nothing to do with anything technical about those vehicles." If he were to make a technical recommendation, he would increase that weight. However, a person towing a 5500-pound trailer did not have the same margin of safety as a person towing a 3500-pound trailer. He did not recommend that any kind of car tow a trailer weighing over 5000 pounds. But this recommendation related only to "coupler strength." He would advise a customer that it was all right to tow a trailer weighing 5000 pounds. On the other hand, if the trailer weighed 5500 or even 5100 pounds, he would attempt to "upgrade" the customer to the use of a truck.

Also as L. S. Shoen, he generally acknowledged that the maximum controllable speed might come down as the trailer load increased. Notwithstanding the recommendation in the trailer user's guide, he did not believe that 45 miles per hour was an actual maximum controllable speed. He did not believe that the effect upon trailer stability of increasing weight and speed could be expressed in a simple linear progression. Tests conducted by U-Haul and others did not show consistent increases of all types of hitch ball forces when the trailer tongue weight was increased. Trailer stability in his opinion depended to a much greater extent on the individual characteristics of a trailer's design. A given trailer might even be more stable when more heavily loaded. He did not understand Dr. Dreifke's formula. He did not know how to compute maximum controllable speed and did not know if anyone did know how to do this. He did not consider statements in the trailer user's guide that stability decreases going downhill and that speed should be decreased before starting downhill to be statements of fact. Rather, they were a way of communicating to the customer that caution was advisable.

During the examination by defense counsel, Abramovage testified that from his experience in towing trailers, if one pressed the brake all the way to the floor (as plaintiff testified his wife did) but could not stop, it would indicate that the brakes on the car were malfunctioning. U-Haul had conducted braking tests at speeds from 30 to 60 miles per hour using a 5000-pound RV trailer with a 500-pound tongue weight in which the car and trailer remained stable within a 12-foot lane and exceeded the braking performance criteria established by the Society of Automotive Engineers (SAE) for a car alone.

He also testified concerning an independent report by Janeway Engineering Co. that analyzed data concerning dynamic hitch loads.

Among the conclusions stated in this report, apparently contrary to those reached by Diboll and Dreifke, were the following: dynamic hitch loads are only roughly related to gross trailer weights when the same type of equipment is utilized; the overriding factor in the level of dynamic loads is the type of trailer used; and direct comparison of the dynamic loads with weight-distributing and frame type (weight-carrying) hitches shows no consistent superiority for either one. The report also states that although the dynamic characteristics of the tow car-trailer system were outside its scope, it had been observed that riding qualities generally improved as trailer gross weight increased, and that trailer weight *per se* should not be subject to limitation from the standpoint of safety. Apparently, the report did not deal with U-Haul trailers, but travel trailers.

Also during examination by defense counsel, Abramovage testified concerning U-Haul's extensive testing facilities. A movie was shown to the jury in which a prototype RV trailer loaded to 4400 pounds was road-tested with varying weight distributions at speeds of up to 70 miles per hour on a course that included extended downhill sections. When loaded with a proper 60-40 forward weight distribution, as well as with a 50-50 weight distribution, no serious oscillations occurred. The driver did not brake when traveling downhill with these weight distributions. When the trailer was loaded with a 40-60 weight distribution, mild to moderate oscillations were encountered. When a speed of 64 miles per hour was reached traveling downhill, the oscillations became severe and worsened when the driver braked. When he quit braking and accelerated the oscillations apparently dissipated.

We hold that the evidence presented a jury question as to whether there was a failure of the trailer to perform in the manner reasonably to be expected in the light of its nature and intended function, which proximately caused the accident. The testimony of the plaintiff and his son tended to show that the trailer was loaded with a proper forward weight distribution. Both Shoen and Abramovage indicated that a 5000-pound gross weight was within reasonable expectation. There was evidence that a decal was posted in all RV trailers stating the 3500-pound weight limitation and that the trailer user's guide was available to the plaintiff. However, William Johnson stated that he saw no notice concerning weight on the trailer. Also, L. S. Shoen testified that he did not expect a trailer user to weigh a loaded trailer as recommended in the trailer user's guide.

The plaintiff's uncontradicted testimony was that his wife was driving at the recommended speed of 45 miles per hour, that the trailer began to sway when she applied the brakes to hold down the speed while descending a long hill, that the sway increased and caused the car and

trailer to swerve from lane to lane, that she steered against the direction in which the car was being pushed in an attempt to prevent the car from leaving the road, and that she pushed the brakes "all the way down" without noticeable effect. Among other things, plaintiff's experts testified that it was unsafe for a 5000-pound automobile equipped with a weight-carrying hitch to tow a 5000-pound trailer at 45 miles per hour, that braking could cause a trailer to oscillate, and that an automobile would be less able to exert controlling forces on a trailer when traveling downhill.

We find no basis for concluding that the plaintiff's account was totally incredible or that it demonstrated improper driving by Mrs. Johnson which proximately caused the accident. Unlike *Pedrick*, the plaintiff's testimony was not contradicted by that of disinterested eyewitnesses. (See also *Belleville National Savings Bank v. General Motors Corp.* (1974), 20 Ill. App. 3d 707, 313 N.E.2d 631; *Perec v. Little* (1969), 106 Ill. App. 2d 308, 245 N.E.2d 306.) A jury might well question the plaintiff's statements that he did not feel the car skid when its power brakes were fully applied, and that he "couldn't tell" whether the application of the brakes tended to slow the car. The trier of fact could also weigh the fact that Mrs. Johnson had taken medicine for high blood pressure earlier that day and the plaintiff's statement that Mrs. Johnson had to steer to the left when the car swerved to the right in order to prevent them from going down a 300-foot embankment on the right side of the highway. However, the evidence as a whole would appear to allow the conclusion that the car and trailer had become uncontrollable even before Mrs. Johnson attempted to regain control by steering and heavy braking.

■ The defendants extensively argue that the opinions of Diboll and Dreifke were without probative value. The conclusions of these witnesses often were admittedly theoretical and untested. However, their opinions had some basis in engineering expertise, personal experience, or both. Abramovage and Shoen, based on the company's testing and their own personal towing of U-Haul trailers, obviously believed them to be safe at normal highway speeds. However, they generally agreed that, everything else being equal, the likelihood of an accident increased as weight and speed increased. Neither Abramovage nor Shoen professed a sufficient understanding of Dr. Dreifke's formula to be able to explain exactly why his conclusions were entitled to no credence whatsoever. The bases for the plaintiff's experts' opinions were not specifically and overwhelmingly destroyed by L. S. Shoen, Abramovage, or the evidence concerning the testing of U-Haul trailers and accident statistics. For this reason, *St. Paul Fire & Marine Insurance Co. v. Michelin Tire Corp.* (1973), 12 Ill. App. 3d 165, 298 N.E.2d 289, and *Mullen v. General Motors Corp.* (1975), 32 Ill. App. 3d 122, 336 N.E.2d 338, cited by defendants, are distinguishable.

(See *Anderson v. General Grinding Wheel Corp.* (1979), 74 Ill. App. 3d, 270, 393 N.E.2d 9.) Whether a different conclusion would have been reached had the defendants proceeded with their own case cannot be decided. On the evidence of record, the general rule applies that the weight to be assigned to an expert opinion is for the jury to determine in light of his credentials and the factual basis for his opinion. (*Walczak v. General Motors Corp.* (1976), 34 Ill. App. 3d 773, 340 N.E.2d 684; *Buckler v. Sinclair Refining* (1966), 68 Ill. App. 2d 283, 216 N.E.2d 14.) The evidence raised questions of fact for the jury to decide. *Tulgetske v. R. D. Werner Co.* (1980), 86 Ill. App. 3d 1033, 408 N.E.2d 492; *Reynolds v. American Oil Co.* (1975), 32 Ill. App. 3d 905, 337 N.E.2d 403.

For the above reasons, we conclude that the trial court erred in directing a verdict for the defendants on counts V and VI of the plaintiff's complaint.

The negligence counts of the complaint contained allegations that, among other things, the defendants were negligent in allowing this RV trailer, as foreseeably loaded, to be towed by an automobile not equipped with a weight-distributing hitch when they knew or should have known of the dangers involved, and that the defendants negligently failed to warn the plaintiff of those dangers.

The mere happening of the accident did not prove the defendants negligent. However, much of the other evidence already discussed relates to the issues of what the defendants knew or by the exercise of reasonable care could have known about the alleged dangers of this car-trailer combination, and whether they breached their duty of care. Other evidence was also relevant to those issues.

Defendant Albright testified that to his knowledge he had never failed to give a U-Haul trailer user's guide (which contained the 3500-pound weight-limit recommendation) to a customer and that signs concerning the weight limit were posted in all the trailers. However, he was not aware, and no U-Haul publication as of the date of the accident informed the customer, that the weight limit would be exceeded when the RV trailer was only partially loaded. Likewise, no U-Haul publication provided sufficient information to allow the customer to calculate the gross trailer weight based on volume and average weight per cubic foot of household goods. He had not received any instructions from U-Haul concerning weight-distributing hitches and did not know whether U-Haul trailers could be towed by a car equipped with a weight-distributing hitch.

Professor Diboll testified that the use of a weight-distributing hitch was desirable where the trailer weight exceeded 2000 pounds, despite the possibility that this type of hitch might be improperly installed or adjusted. If a trailer was loaded too heavily or otherwise incorrectly, then

neither type of hitch would make the car-trailer combination stable. But the weight-distributing hitch might be able to make a given car and trailer stable that would be unstable if a weight-carrying hitch were used. The only advantage of the weight-carrying hitch was that it was easier to install. At 40 or 45 miles per hour, a weight-carrying hitch had no advantages.

Professor Diboll stated that weight-distributing hitch usages and recommendations were common knowledge in the automobile and travel trailer industries. He was examined concerning the recommendations in numerous automotive owner manuals that contained recommendations similar to the manual for a 1969 Oldsmobile (such as plaintiff's), which recommended use of a weight-distributing hitch for trailers weighing over 2000 pounds. He testified that the recommendations of the Society of Automotive Engineers (SAE) and the Vehicle Equipment Safety Commission (VESC) concerning weight-distributing hitches did not appear to exclude rental utility trailers. While not claiming to be an expert in the custom and practice of the rental utility trailer industry, he stated that it was not the custom and practice in that industry to use weight-distributing hitches.

During Dr. Dreifke's testimony, defense counsel stipulated that U-Haul had known of his formula since the time of his testimony in the Slightom case in 1967. On cross-examination Dreifke stated that he was attempting to apply his formula to the use of a weight-distributing hitch, which involved a different problem than the use of a weight-carrying hitch. A weight-distributing hitch "* * * tends to make the car and trailer a continuous elastic beam, in a sense, so that it's different than two separate devices that are connected only by a universal joint that's free to move in all directions." It was his impression that the use of a weight-distributing hitch could produce a higher or lower maximum controllable speed depending on how the hitch was designed and installed.

L. S. Shoen did not dispute the fact that the automobile manu-facturers' manuals generally contained recommendations substantially similar to the recommendation in the 1969 Oldsmobile manual that a weight-equalizing hitch should be used for trailers of a gross weight over 2000 pounds. The manuals did not expressly exclude U-Haul or rental utility trailers from the recommendations. However, based on his consultation with persons employed by the automobile companies, he had concluded that the recommendations did not apply to the U-Haul business.

The bumper hitch commonly provided to U-Haul customers was a weight-carrying hitch. U-Haul trailers could not be attached to a weight-distributing hitch without modification. U-Haul had experimented unsuccessfully with developing a weight-distributing hitch. Shoen

believed that a car and trailer would be less stable where a portion of the tongue load was transferred to the front wheels of the car. He stated that other rental utility trailer companies rented trailers as large as the U-Haul 6-by 14-foot HV trailer, although he could not recall the name of any of these companies.

John Abramovage testified that the 1973 recommendation of the SAE Trailer Coupling and Hitch Committee concerning the use of a weight distributing hitch for trailers over 3500 pounds was intended as a guide for designers and not an "in-use" standard based on dynamic testing. He was the chairman of the Trailer Coupling and Hitch Committee. The weight-distributing hitch recommendation was eliminated in 1975. The VESC eliminated its own comparable recommendation in 1977. The SAE Combination Vehicle Dynamics Committee had never adopted a recommendation referring to weight-distributing hitches.

The automobile manuals, however, contained essentially the same recommendations for the use of a weight-distributing hitch in 1978 as they had 10 years earlier. Some also contained warnings as to maximum trailer weights. For example, a 1978 Buick owner's manual warned not to tow any trailer over 4000 pounds gross trailer weight, no matter what trailer towing equipment was installed, because this could seriously affect the car's performance and handling and result in personal injury. The automobile makers also published trailer towing guides containing weight-equalizing hitch recommendations and explaining the types of hitches and equipment available from the company. These guides appear to be directed at the owners of recreational and travel trailers. However, they include passing references to "utility trailers." Abramovage did not understand this phrase to refer to U-Haul trailers and suggested that the phrase "rental utility trailers" would have been used if the reference had been to U-Haul trailers. As L. S. Shoen, Abramovage testified that his conversations with persons in the automotive industry had led him to conclude that the manuals did not refer to rental utility trailers.

At one point Abramovage testified that weight-distributing hitches were unsafe whether used with recreational or U-Haul trailers. Later, he stated that for large trailers the weight-distributing hitch was a proven device. By "large trailer," he meant a vacation or travel trailer with a large "sail" area on the side of the vehicle. He considered weight only one of many factors in classifying a trailer as a "large trailer." In his opinion, U-Haul trailers were not large trailers and did not need weight-distributing hitches.

The 1974 U-Haul trailer user's guide contained a statement that passenger cars equipped with "factory towing packages (special hitch, brakes, springs and shocks)," were capable of towing U-Haul trailers loaded with 25 percent more weight than the stated 3500-pound limit if

such towing was within the automobile manufacturer's recommendations. Mr. Abramovage said he did not know what "special hitch" meant in this context. He could not understand the reasoning of the booklet's author, because it was his opinion that a vehicle without special equipment was quite capable of pulling a fully loaded RV trailer.

Michael Shoen, U-Haul safety director, also testified under section 60 examination. Since November of 1973 he had overseen the compilation of the trailer user's guide. The language concerning specially equipped tow vehicles for trailers weighing over 3500 pounds was dropped in 1976 or 1977. He had read hundreds of accident reports concerning U-Haul trailers. A number of them mentioned trailer sway. However, he stated that trailer sway was not in itself a cause of accidents, but rather an effect of such causes as improper loading, winds, or improper steering. He also explained that after talking with a number of qualified people, he concluded that Dr. Dreifke's formula was entitled to no credence for what it purported to calculate.

Defendant Amerco was responsible for the design and specifications according to which U-Haul trailers were manufactured. A manufacturer is held to the degree of knowledge and skill of experts. (*Moren v. Samuel M. Langston Co.* (1968), 96 Ill. App. 2d 133, 237 N.E.2d 759.) A manufacturer has a duty of due care to design a product that will be reasonably safe for its intended use and for any foreseeable use, although the manufacturer will not be held liable for injuries resulting from obvious dangers. *Flaugher v. Sears Roebuck & Co.* (1978), 61 Ill. App. 3d 671, 378 N.E.2d 337.

The U-Haul officers did not deny that prior to the accident they knew of the actual opinions or underlying principles testified to by the plaintiff's experts. The U-Haul officers were also aware of the recommendations in the automobile manuals concerning trailer towing and the weight-distributing hitch, as well as the 1973 SAE and VESC design recommendations.

We have already decided that the opinions of the plaintiff's experts constituted some evidence that the towing of the RV trailer under the instant circumstances was unsafe and proximately caused the accident. Michael Shoen testified that consultation with qualified individuals had led him to conclude that the Dreifke formula did not calculate what it purported to. However, because the substance of what he was told is not in evidence, and he himself did not purport to possess the qualifications requisite to refuting Dreifke, we cannot say that Michael Shoen's testimony weakened the probative value of Dreifke's testimony.

The defendants point to Professor Diboll's testimony that a weight-distributing hitch would improve front-wheel traction and prevent the front wheels from skidding during evasive maneuvers. They argue that

his testimony concerning stability and controllability related solely to this phenomenon and emphasize that there was no evidence of skid or loss of steering here. However, his explanation of the purpose for distributing the tongue weight over the four wheels of the car related not only to an increase in front-wheel traction, but also to an increase in the car's ability to exert controlling forces on the trailer. In addition, the value of this evidence need not depend on proof that the front wheels skidded or that steering was lost during the chain of causation leading to the accident. Even without proof that a weight-distributing hitch would have prevented the accident, the evidence concerning the benefit of this hitch type would be relevant to the issue of whether a duty of care was breached if such a hitch should be used in towing trailers of a gross weight in excess of 2000 pounds or 3500 pounds.

The recommendations in the automobile manufacturers' literature were relevant evidence of common usage and practice with respect to both the use of weight-distributing hitches and the care to be observed generally in the towing of heavy trailers. As with Michael Schoen's conclusion about the Dreifke formula, the conclusions of John Abramovage and L. S. Shoen concerning automotive literature rested primarily on their consultation with sources not in evidence. Their conclusions that U-Haul trailers weighing 5000 pounds could be safely towed by passenger automobiles and that weight-distributing hitches should not be used on U-Haul trailers were certainly probative in light of their extensive experience in the rental utility trailer industry. However, this did not constitute a basis for withdrawing from the jury's consideration evidence to the contrary.

Similarly, the SAE and VESC standards were relevant to the extent that they recommended the use of a weight-equalizing hitch exclusively in the design and use of trailers weighing over 3500 pounds. The jury of course could weigh the fact that these recommendations were subsequently eliminated and were not based on dynamic testing.

■■ We also note that the evidence tended to raise questions of whether there was a breach of a duty to warn adequately the plaintiff of dangers involved in the foreseeable use of the trailer. Where the manufacturer undertakes to instruct in the proper use of the product and the instruction is not adequate or accurate, the failure may be negligence. *Wallinger v. Martin Stamping & Stove Co.* (1968), 93 Ill. App. 2d 437, 236 N.E.2d 755.

However, the duties of care discussed above would not appear to apply to defendant Albright. The evidence indicates that Albright neither knew nor had reason to know that the towing of the trailer under the instant conditions might be unsafe.

On the other hand, L. S. Shoen testified that defendant U-Haul Company of Central Illinois was wholly owned by the same holding

company that owned defendant Amerco, Inc. Apparently, the sole reason for the existence of defendant U-Haul of Central Illinois was to distribute U-Haul products. The defendants do not suggest otherwise. In such a case, the reasons for the rule protecting retailers or distributors from liability under certain circumstances do not apply. *Moore v. Jewel Tea Co.* (1970), 46 Ill. 2d 288, 263 N.E.2d 103.

■■ Accordingly, we conclude that the trial court erred in directing a verdict for U-Haul Company of Central Illinois and Amerco on counts I, II, III and IV and in excluding the evidence regarding weight-distributing hitches.

As an alternative theory, apparently of negligence, although not expressly pleaded, the plaintiff contends that the oscillation of the trailer may have resulted from a loosening or weakening of the hitch or hitch attachments, and that the defendants were negligent for allowing the trailer to be connected to the hitch on his car, this hitch only being rated to tow class 1 or class 2 trailers weighing a maximum of 2000 or 3500 pounds, respectively.

There is no evidence to support this theory. From the plaintiff's account of the accident, it appears that the tapping of the brake was the immediate cause of the oscillation of the trailer. The plaintiff testified that the trailer separated from the car at the time of impact, that the hitch did not break but separated from the car at its points of attachment, and that he had no way to know when the hitch started to separate. Henry Tummons, the insurance adjustor who investigated the accident testified that he was not sure, but he did not think that the hitch failed. He did not report this as a cause of the accident. Both Diboll and Abramovage testified that the SAE and VESC hitch strength recommendations were static, that is, stationary, strength recommendations not applicable to determining the ability of a hitch to withstand dynamic forces.

Therefore, the trial court was correct in granting a directed verdict for the defendants as the evidence failed to show or suggest that a condition of hitch strength caused or contributed to the accident, and the court correctly excluded evidence of hitch strength recommendations.

In examining John Abramovage the plaintiff inconclusively sought to establish that trailer "wheel hop" during braking could cause the trailer to become unstable. There was no evidence of wheel hop during the accident in question, and the plaintiff does not specifically argue this issue on appeal. The plaintiff testified that the car continued to gain speed as it traveled down the hill. On the other hand, wheel hop was apparently a phenomenon that occurred when a towing vehicle decelerated and thereby activated the trailer brakes. Accordingly, the trial court was correct in directing a verdict on this issue.

The counts of the complaint seeking $10,000,000 in punitive damages

alleged, among other things, that the defendants Amerco, Inc., and U-Haul Company of Central Illinois, recklessly and with conscious disregard for the safety of the plaintiff and others, rented the trailer to the plaintiff well knowing that to do so would expose the plaintiff and others to an unreasonable risk of bodily harm and injury.

Defendant cites the often-quoted test for imposing liability for willful and wanton misconduct:

> "To constitute an act wanton, the party doing the act or failing to act must be conscious of his conduct, and, though having no intent to injure, must be conscious, from his knowledge of the surrounding circumstances and existing conditions, that his conduct will naturally and probably result in injury. An intentional disregard of a known duty necessary to the safety of the person or property of another, and an entire absence of care for the life, person or property of others, such as exhibits a conscious indifference to consequences, makes a case of constructive or legal wilfulness." (*Bartolucci v. Falleti* (1943), 382 Ill. 168, 174, 46 N.E.2d 980, 983.)

It has also been said that whether an act is willful and wanton is greatly dependent upon the particular circumstances of each case. *Moore v. Jewel Tea Co.* (1969), 116 Ill. App. 2d 109, 253 N.E.2d 636, *aff'd* (1970), 46 Ill. 2d 288, 263 N.E.2d 103.

The parties' briefs make no real attempt to apply these considerations to the facts of this case. The defendants argue that, *a fortiori*, evidence which is insufficient to establish negligence or strict liability is insufficient to establish willful and wanton misconduct, which requires a higher standard of fault. However, they do not direct our attention to specifics that would justify affirming the trial court's action on the willful and wanton counts where we have determined that it was error to direct a verdict on the strict liability and negligence counts, the allegations of which are essentially repeated in the willful and wanton counts. Neither the parties nor the trial court have clarified the issue of when punitive damages may or may not be awarded in cases of unintended accidental injury.

We believe it would be premature to foreclose further proceedings on the willful and wanton counts when the defendants' case has not yet been presented. Accordingly, we reverse the judgment directing a verdict on counts VII and VIII of the complaint.

As the case must be retried, we must consider certain rulings on the admissibility of evidence raised by the parties.

The plaintiff contends that the trial court improperly refused to admit evidence of two prior accidents involving U-Haul trailers (the Slightom and Hayman accidents) which resulted in jury trials and verdicts against

U-Haul, as well as over 1000 written accident reports submitted to U-Haul by trailer users. The plaintiff argues as follows:

> "The Slightom accident, the Hayman accident and over 1000 accident reports had these items in common: They all involved U-Haul tandem-axle trailers; the trailers weighed more than 2000 pounds when loaded; they were all towed by passenger cars not equipped with weight equalizing hitches; the speeds of all the vehicles were 45 miles, or under, but over 35 miles per hour; all the trailers were loaded with ordinary household goods; no unusual circumstances on the highway were encountered; and, all of the accidents started by swerving, swaying or fishtailing. That these accidents could have been found by the jury to have a common cause and to constitute notice to the defendants of a dangerous condition seems patent in view of the testimony of Professor Diboll and Dr. Dreifke."

■■ It has been held that evidence of other sufficiently related accidents, although not competent for the purpose of showing independent acts of negligence, may be admissible to show notice to the defendant of an unsafe condition and that the unsafe condition caused other accidents. (*Moore v. Jewel Tea Co.* (1969), 116 Ill. App. 2d 109, 253 N.E.2d 636, *affirmed* (1970), 46 Ill. 2d 288, 263 N.E.2d 103; *Ray v. Cock Robin, Inc.* (1974), 57 Ill. 2d 19, 310 N.E.2d 9.) Whether this evidence is admissible is a matter for the exercise of the sound discretion of the trial judge. *Moore v. Jewel Tea Co.*

■■ To avoid the hearsay rule, the instant accident reports would have been admissible, if at all, to prove notice, rather than the truth of the matters stated. (See *Frisch v. International Harvester Co.* (1975), 33 Ill. App. 3d 507, 338 N.E.2d 90.) In plaintiff's offer of proof, counsel emphasized that the reports were not offered on the issue of causation.

Plaintiff relies on *Frisch v. International Harvester Co.* and *Moore v. Jewel Tea Co.* in seeking admission of the reports. However, the trial court's order rejecting the reports reflects a careful consideration of both of these cases.

In *Frisch*, the trial court was held to have properly allowed the plaintiff to introduce letters concerning prior occurrences during the examination of a former employee of the defendant, who himself was the author of some of the letters. The appellate court noted that there had been a bench trial and found no suggestion that the experienced trial judge had misapplied the evidence to establish cause. Under these circumstances, the letters were held admissible to show notice of an unreasonably dangerous condition under the reasoning in *Moore*. As also noted in the instant trial court's order, *Frisch* did not involve a punitive damages claim, and the admission of the letters in that case thus raised no

issue of the propriety of allowing punitive damages on the basis of unsworn testimony.

In *Moore*, the trial court was held to have properly exercised its discretion in admitting evidence of the prior instances in which an unopened can of Drano had exploded. In its order, the instant trial court noted that *Moore* was comparable to the issue before us to the extent that it was a product liability case involving a punitive damages claim and the admission of evidence of prior accidents not consisting of the testimony of actual witnesses. However, the court found *Moore* distinguishable because in that case the plaintiff did nothing more than purchase a can of Drano which spontaneously exploded, while the plaintiff here loaded and towed the trailer. The court also noted that the evidence admitted in *Moore* had been carefully limited. The trial court in *Moore* "* * * not only rejected cases where water or some outside material was added to the can, it refused plaintiffs' request to allow evidence of prior spontaneous explosions which occurred after the Drano had been subjected to its normal use." (116 Ill. App. 2d 109, 129, 253 N.E.2d 636, 645.) The court further quoted language from the *Moore* opinion to the effect that the trial court there did not abuse its discretion in refusing to allow the defendants to present evidence on the merits of the prior claims, considering the distraction of the jury and undue consumption of time that would have resulted. Here the court reasoned that there would be a manifest injustice in refusing to allow the defendants to present evidence on the merits of the prior claims where, as here, the conduct of the plaintiffs and their son may have affected causation. Because of the difficulty in determining the cause of the prior accidents, the court ordered that the reports be excluded.

■■ We cannot say that the trial court abused its discretion in so ruling. The complexity of factors bearing upon the issue of whether a trailer is unreasonably dangerous under a certain set of conditions made it impossible to ascertain from the sketchy information provided in the reports which of the prior occurrences were sufficiently comparable to the Johnson accident. In addition, an examination of individual reports commonly reveals, contrary to the plaintiff's assertion, either silence or dissimilarity concerning essential factors such as how the trailer was loaded, the size and nature of the tow vehicle, the type of hitch, as well as other factors.

■■ The plaintiff also offered the testimony of Larry Slightom concerning an accident in 1965. The accident involved a 1964 Ford Mustang towing a U-Haul HV 6- by 14-foot trailer loaded to a considerably greater weight than that of the tow car. At the time of the accident, the rear of the tow car jumped up and down while descending a small hill. The car and trailer skidded sideways and were struck by a truck. The driver of the

tow car died, and Larry Slightom, a passenger, was severely injured and disfigured. There were discrepancies between Slightom's testimony during the offer of proof at the time of this trial and the transcript of his testimony at the previous trial. These included, among other things, whether the jumping up and down of the tow car was accompanied by a swaying of the car, the extent of Slightom's knowledge as to the loading of the trailer, and the weight of the goods in the trailer. As noted in the trial court's order excluding the evidence, the behavior of the trailer itself at the time of the accident was not made clear. The court also found that Slightom's disfigurement would produce passion and prejudice in the minds of the jury out of proportion to the probative value of his testimony were it deemed admissible.

The Hayman accident occurred in 1968, but the lawsuit concerning it was not tried until after the occurrence of the present accident. The defendants contend that the only information U-Haul had concerning the Hayman accident prior to the date of this accident was Margaret Hayman's accident report, her written statement to an insurance adjuster, and her discovery deposition. The first two only generally state that she felt something wrong with the trailer or hitch as she was descending a long hill. In the deposition, she stated that the trailer "wiggled" after she applied the brakes. However, she was able to pull onto the right shoulder of the road. Because the shoulder was soft and muddy she was unable to pull the trailer completely off the highway. Subsequently, another vehicle collided with the rear of the trailer. The plaintiff offered to call Margaret Hayman and other witnesses to testify and also offered various exhibits including the complaint.

It is apparent that the admission of evidence offered by the plaintiff concerning these accidents would involve substantial disputes both as to the actual circumstances of the accidents and the nature and extent of the notice provided. We cannot say that the trial court abused its discretion in excluding this evidence in view of its potential for diverting the jury's attention from the instant occurrence and confusing the issues. *Fullerton v. Robson* (1978), 61 Ill. App. 3d 93, 377 N.E.2d 1044.

In addition, we do not believe that the accidents were of sufficient similarity to the instant accident. While evidence of prior accidents has been admitted in a number of cases involving products or structures under the control of the plaintiff or a person other than the defendant (see, *e.g., Charleston National Bank v. International Harvester Co.* (1974), 22 Ill. App. 3d 999, 317 N.E.2d 585; *Grant v. Joseph J. Duffy Co.* (1974), 20 Ill. App. 3d 669, 314 N.E.2d 478; *Vlahovich v. Betts Machine Co.* (1970), 45 Ill. 2d 506, 260 N.E.2d 230; *Rucker v. Norfolk & Western Ry. Co.* (1979), 77 Ill. 2d 434, 396 N.E.2d 534), significant and numerous variables were different or unaccounted for in the prior occurrences offered here.

We cannot say that the trial court abused its discretion in concluding that any probative value was outweighed by the potential for prejudice. Other cases such as *Ray v. Cock Robin* and *Chicago v. Jarvis* (1907), 226 Ill. 614, 80 N.E. 1079, are distinguishable because they involve prior accidents that gave clear notice of a specific dangerous condition at a certain site within the defendant's control.

We would also note that other evidence admitted by the court served to inform the jury that U-Haul was aware of prior accidents possibly involving dangerous conditions of its trailers. As already mentioned, Michael Shoen, U-Haul safety director, testified that he had read hundreds of accident reports and that a number of them mentioned trailer sway. The accident statistics introduced included some classification according to cause. The court also allowed Dr. Dreifke to testify that he had previously testified and been cross-examined concerning his formula in "the U-Haul case in the late 60's."

For the above reasons, we conclude that the trial court did not abuse its discretion in refusing to admit the 1000 accident reports and the evidence of the Slightom and Hayman accidents.

The judgment of the Circuit Court of St. Clair County is affirmed in part and reversed in part as explained herein, and the cause is remanded for a new trial consistent with the views expressed in this opinion.

Affirmed in part; reversed in part and remanded for a new trial.

HARRISON and SPOMER, JJ., concur.